564 S.E.2d 362

**The STATE, Respondent,**

v.

**Sharron Blasky JARRELL, Appellant.**

No. 3489.

Court of Appeals of South Carolina.

Heard Feb. 5, 2002.
Decided May 13, 2002.
Rehearing Denied June 19, 2002.

92

94

James W. Boyd, of Rock Hill, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Robert E. Bogan and Assistant Attorney General Toyya Brawley Gray; all of Columbia; and Solicitor Thomas E. Pope, of York, for respondent.

## HEARN, C.J.

Sharron Jarrell was charged with homicide by child abuse, accessory before the fact of murder, accessory after the fact of murder, first degree criminal sexual conduct, and three counts of unlawful conduct towards a child. A jury found Jarrell guilty of all charges except criminal sexual conduct first degree. She appeals her convictions alleging several errors occurred during the trial.[1] We affirm.

## FACTS

On June 25, 1998, Jarrell called EMS and reported that her ten-month-old baby, Donald Jarrell Jr., was not breathing. When paramedics arrived, they found the baby was dead and rigor mortis had begun to set in. When the police arrived at the residence they observed that the trailer was filthy with animal feces, fly strips, baby bottles with clabbered milk, unwashed dishes, dirty diapers, and it smelled of urine. Residing at the trailer with Jarrell at the time of the baby's death were Donald Jarrell Sr. (Father), Jarrell's mother Grenetta Blaskey, and Jarrell's three other minor children. The Department of Social Services took temporary emergency custody of the three children due to the condition of the residence.

After an autopsy, the coroner found the baby had suffered severe repeated sexual abuse and determined that he died from suffocation and smothering the previous day. Investigators asked Jarrell about her whereabouts and activities on that date. She responded that she had been shopping with her mother and children. After receiving a page from her husband, she returned home around 9 P.M.

---

1. Jarrell does not appeal her convictions on three counts of unlawful conduct towards a child.

She initially stated that when she returned home she checked on the baby, kissed him goodnight, and he seemed fine. However, Jarrell later changed her story and stated that she thought Father smothered the baby because of his bad temper and he could not handle the baby's crying. Later, she changed her story again and said that she knew the baby was dead when she returned home that evening, but she did not call an ambulance that night because she did not want to upset her mother and children. The next morning upon "discovering" her baby's death, Jarrell immediately called Father at work, and then called EMS. That same day, she reported the baby's death to the insurance company which had issued a $24,000 life insurance policy on the child.

Jarrell and Father were arrested for the death of her baby. After her arrest, she admitted to police that she knew Father was molesting the baby. While in jail, Jarrell discussed the abuse and death of her baby with several inmates: Mary Gillespy, Julie Williams, Angela Doctor, and Tracye Graves. In her conversations with these inmates, Jarrell admitted she used a dildo on the baby to prepare him for sex with Father. She also stated that she and Father planned to kill the baby by smothering him to make it appear to be a SIDS death because the baby had an upcoming doctor's appointment and the abuse would be readily apparent to anyone examining the baby. Jarrell and Father planned that he would kill the baby while Jarrell was out shopping and he would page her to return home when the baby was dead.

Father was charged with murder, to which he pled guilty but mentally ill. Jarrell was indicted for homicide by child abuse, accessory before the fact of murder, accessory after the fact of murder, and first degree criminal sexual conduct. Jarrell was convicted on all counts except criminal sexual conduct. She received life sentences for the homicide by child abuse and accessory before the fact convictions, and fifteen years for the accessory after the fact conviction, concurrent to her life sentences.

## DISCUSSION

### I. Directed Verdict on Homicide by Child Abuse Charge

Jarrell first claims the trial court erred by failing to grant

her a directed verdict on the homicide by child abuse charge.[2]
We disagree.

When considering the trial court's denial of a criminal defendant's motion for directed verdict, "[w]e must view the evidence in the light most favorable to the State and determine whether there is any direct or substantial circumstantial evidence that reasonably tends to prove the defendant's guilt or from which his guilt may be logically deduced." *State v. Pinckney*, 339 S.C. 346, 349, 529 S.E.2d 526, 527 (2000). In ruling on a directed verdict motion, the trial court is concerned with the existence or non-existence of evidence, not its weight. *Id.* Furthermore, "[i]f the State presents any evidence which reasonably tends to prove the defendant's guilt or from which the defendant's guilt could be fairly and logically deduced, the case must go to the jury." *State v. Harris*, 342 S.C. 191, 203, 535 S.E.2d 652, 658 (Ct.App.2000).

The jury found Jarrell guilty of homicide by child abuse "under circumstances manifesting an extreme indifference to human life." S.C.Code Ann. § 16–3–85(A)(1) (Supp. 2001). Jarrell argues the trial court erred in denying her motion for directed verdict because the State failed to prove the proper mental state. Specifically, she claims the evidence presented at trial showed she participated in planning the death of the baby which would constitute malice. She contends that because one cannot have both malice and indifference towards another person, she could not be guilty of homicide under circumstances manifesting an extreme indifference to human life.

Jarrell defines indifference as "impartial, unbiased, or disinterested." Under her definition, she contends that *any* action, or failure to act in the face of a duty, would negate her indifference, thus making it impossible for her to be guilty

---

2. S.C.Code Ann. § 16–3–85 (Supp.2001) defines the crime as follows:
 (A) A person is guilty of homicide by child abuse if the person:
 (1) causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life; or
 (2) knowingly aids and abets another person to commit child abuse or neglect, and the child abuse or neglect results in the death of a child under eleven.

under this specific statute. Jarrell's definition, however, fails to focus on the term *extreme indifference* as it has historically been interpreted in a criminal context.

Extreme indifference is in the nature of "a culpable mental state . . . and therefore is akin to intent." *State v. Vowell,* 276 Ark. 258, 634 S.W.2d 118, 119 (1982) (citation omitted). In this state, indifference in the context of criminal statutes has been compared to the conscious act of disregarding a risk which a person's conduct has created, or a failure to exercise ordinary or due care. *See State v. Rowell,* 326 S.C. 313, 315, 487 S.E.2d 185, 186 (1997) (discussing the requisite mental state for recklessness); *see generally Hooper v. Rockwell,* 334 S.C. 281, 297, 513 S.E.2d 358, 367 (1999) ("Conduct of the parent which evinces a settled purpose to forego parental duties may fairly be characterized as wilful because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent."). At least one other jurisdiction with a similar statute has found that "[a] person acts 'under circumstances manifesting extreme indifference to the value of human life' when he engages in deliberate conduct which culminates in the death of some person." *Davis v. State,* 325 Ark. 96, 925 S.W.2d 768, 773 (1996). Therefore, we reject Jarrell's definition of the term indifference and hold that in the context of homicide by abuse statutes, extreme indifference is a mental state akin to intent characterized by a deliberate act culminating in death.

In light of this definition of extreme indifference, and after reviewing the record, we find that substantial evidence supports the denial of Jarrell's motion for directed verdict. The State presented evidence of Jarrell's actions in planning the murder both before it occurred, and also presented evidence of her actions on the day of the child's death. Two different levels of intent may be gleaned from her actions depending on the particular point in time. We find the events of the day of the baby's death to be the most significant to our analysis regarding Jarrell's extreme indifference. We agree with Jarrell that her conviction of accessory before the fact of murder indicated she acted with malice aforethought in planning the murder of her child. *See State v. Kelsey,* 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998) ("Malice is the wrongful intent to injure another and indicates a wicked or depraved spirit intent on

doing wrong."). However, Jarrell's affirmative act of leaving her home on the day of the murder operates as a separate and distinct event from the planning of the murder.[3] When she left home, Jarrell created a grave risk of death to her child, evidencing her extreme indifference to his life. She left home knowing her child would be killed while she was gone. Jarrell could have prevented the murder of her son merely by choosing to stay home. Her failure to protect her child is concrete evidence of her indifference towards his life.

A parent has a specific and undelegable duty to serve the best interests of her child and should make every effort not to knowingly place her child in harm's way. *See generally Nash v. Byrd*, 298 S.C. 530, 536, 381 S.E.2d 913, 916 (Ct.App. 1989) (stating parents have a duty to lend their aid in creating an atmosphere that will foster the best interests of their child). We can think of no better example of someone who is indifferent towards life than a mother who leaves her child knowing he will be killed in her absence. Therefore, in light of our holding as to the definition of "extreme indifference" in the context of S.C.Code Ann. § 16–3–85, we find there is ample evidence to support the trial court's denial of the motion for directed verdict.

## II. Written Statement of Mary Gillespy

Mary Gillespy was an inmate incarcerated with Jarrell prior to trial. Jarrell discussed the circumstances of her case with Gillespy. Gillespy testified that Jarrell told her she was aware months before her son's death that her husband was sexually abusing their son. She further stated to Gillespy that she participated in the abuse and would often use a dildo on the baby while she and her husband were having sex. Jarrell told her that the baby had an enlarged rectum because

---

**3.** Although some jurisdictions have held that premeditation is not required to show extreme indifference, other states have held that premeditation may coexist with extreme indifference towards human life. *See Davis,* 925 S.W.2d at 773; *State v. Crowsbreast,* 629 N.W.2d 433, 440 (Minn.2001) ("It is possible for premeditation and extreme indifference to coexist."); *State v. Russell,* 69 Wash.App. 237, 848 P.2d 743, 748 (1993) (stating neither premeditation nor intent is required under homicide by abuse statute in which death is caused under circumstances manifesting an extreme indifference to human life).

of the abuse and she was concerned it would be discovered during an upcoming pediatrician's appointment. Gillespy made a written statement to police regarding the conversations she had with Jarrell. At trial, the State presented Gillespy as a witness and sought to introduce her prior written statement during her direct examination. The trial court admitted the statement over objection. Jarrell contends the trial court erred when it admitted the written statement because it improperly bolstered Gillespy's testimony to the jury. We agree but find the error harmless.

The South Carolina Rules of Evidence permit the admission of hearsay evidence of a prior consistent statement to rebut an allegation that the declarant recently fabricated the story or acted out of an improper influence or motive. Rule 801(d)(1)(B), SCRE. In *State v. Saltz*, 346 S.C. 114, 123–24, 551 S.E.2d 240, 245–46 (2001), our supreme court held that the admission of a witness's prior consistent statement was improper if the witness had not been accused of recent fabrication or improper influence or motive prior to the admission of the statement. The *Saltz* court further stated that any error in admitting the prior consistent statement, even though cumulative to the witness's testimony at trial, would not be considered harmless. "On the contrary, 'it is precisely this cumulative effect which enhances the devastating impact of improper corroboration.' " *Id.* at 124, 551 S.E.2d at 246. The court found the witness's testimony weak and "not particularly credible," thus the improper corroboration could not have been harmless.

In this case, we agree that the admission of Gillespy's prior statement was improper because the admission occurred during the State's direct examination and was not admitted in response to any allegations of recent fabrication or improper influence or motive. Here, unlike *Saltz*, we find this error harmless. In *Saltz*, the court was concerned that the prior oral statement would improperly bolster the credibility of the declarant's *own* oral testimony.[4] That concern is diminished in this case, however, because Gillespy's statement is cumula-

---

4. We note that unlike the present case, the prior consistent statement in *Saltz* was admitted during the testimony of another witness who was not the declarant of the prior consistent statement.

tive not only to her own testimony, but to the testimony of three other witnesses. Doctor, Graves, and Williams all testified to the same information contained in Gillespy's written statement, i.e. that Jarrell participated in the sexual abuse of the baby and planned to kill the baby to hide the abuse from the doctor. If Gillespy's testimony was the only evidence of Jarrell's participation in the abuse and death of her child, we would be constrained to hold that the improper admission of the statement could not be harmless. However, because Gillespy's testimony was cumulative to three other witnesses who testified almost identically, we find the admission of Gillespy's statement harmless. Jarrell was not prejudiced by the admission of the written statement when its contents were corroborated by an abundance of properly admitted testimony from other witnesses. *See State v. South*, 285 S.C. 529, 535, 331 S.E.2d 775, 778 (1985) (stating court erred in admitting officer's notes because they were a prior consistent statement, but held "error was harmless beyond a reasonable doubt since [notes were] cumulative to the abundant amount of similar evidence admitted at trial"). Thus, because we find Gillespy's statement cumulative and substantially identical to other properly admitted evidence, any error caused by the admission of the prior consistent statement is harmless.

### III. Expert Witness Testimony

Jarrell next argues the trial court erred by not admitting the testimony of two expert witnesses, Dr. Pamela Crawford and Dr. Geoffrey McKee. We disagree.

 Rule 702, SCRE, allows the testimony of an expert witness qualified by knowledge, experience, skill, training, or education to assist the jury to understand the evidence or determine an issue. However, even if evidence is admissible under Rule 702, SCRE, it may still be excluded under Rule 403, SCRE, if its probative value is outweighed by its prejudicial effect. *State v. McHoney*, 344 S.C. 85, 96, 544 S.E.2d 30, 35 (2001). "The question of whether to admit or exclude testimony of an expert witness is within the discretion of the trial court. Absent a clear abuse of discretion amounting to an error of law, the trial court's ruling will not be disturbed on appeal." *State v. Weaverling*, 337 S.C. 460, 474, 523 S.E.2d 787, 794 (1999).

## A. Dr. Crawford's Testimony

 Jarrell proffered the testimony and written report of Dr. Pamela Crawford, a forensic psychiatrist, who examined Father to determine his mental competency to stand trial. Jarrell contends the trial court erred in excluding Dr. Crawford's testimony because it was relevant and would have shown that Jarrell and Father were incapable of planning the murder.[5] Jarrell argues this evidence could have affected the jury's deliberations on both the homicide by child abuse and accessory before the fact charges.

Dr. Crawford testified that "insofar as the murder charge" against him, Father lacked the capacity to conform his behavior to the requirements of the law at the time the murder occurred. She stated that she based her opinion "on my understanding that he had done this act in an impulsive way without planning when he was ... experiencing symptoms that are consistent with hypomania." However, she did not exclude the possibility that Father could have planned the baby's death with his wife prior to the event, but at the actual time of the event of death the act was impulsive. She went on to testify that her opinion was based on an "assumption that it was an impulsive not planned act," and further stated that she "would have a different opinion if, if I were to know that they had planned this act, he would have had the capacity to conform if that were the case." The trial court granted the State's motion to exclude Dr. Crawford's testimony stating that "her testimony as I understand it to be his lack of ability to conform does not negate [Father's] ability to plan and ... so I find that it's not relevant to the issues before the court."

We agree with the trial judge that Father's state of mind when he committed the murder has no probative bearing on his capacity to plan. Father's mental state at the time he committed the act is irrelevant to whether Jarrell was an accessory before the fact. An accessory is "[a] person who aids in the commission of a felony or is an accessory before

---

5. Jarrell also claims Dr. Crawford should have been admitted to testify as to the definition of guilty but mentally ill. However, because Jarrell failed to raise this issue at trial, the issue is not preserved for our review. *See Holy Loch Distrib., Inc., v. Hitchcock,* 340 S.C. 20, 24, 531 S.E.2d 282, 284 (2000) (stating that issues not raised and ruled upon in the trial court will not be considered on appeal).

the fact in a commission of a felony by counseling, hiring, or otherwise procuring the felony to be committed ..." S.C.Code Ann. § 16-1-40 (Supp.2001). The important inquiry is whether Jarrell helped to plan, counsel, aid, or procure the crime. Jarrell's argument that because the murder was an impulsive act it is unlikely the parties planned the murder is without merit because the two are not mutually exclusive. Dr. Crawford could not state unequivocally that the murder was impulsive, nor could she state that even if it was an impulsive act at the time, that Father and Jarrell could not have planned the murder beforehand. Moreover, Crawford admitted her opinion was based on an "assumption" that the act was impulsive. This assumption is not probative of whether or not Father and Jarrell planned to kill the child. Therefore, because the testimony was not relevant to the issue of whether Jarrell and Father could have planned the death of their child, we find no error in the trial court's exclusion of Crawford's testimony.

### B. Dr. McKee's Testimony

Jarrell next proffered the testimony of Dr. Geoffrey McKee, a forensic psychologist, who examined her to see if she fit the profile of a pedophile. McKee testified that Jarrell did not fit the "diagnostic qualifications for pedophilia"; however, the trial court refused to allow his testimony. Jarrell argues this testimony should have been admitted because it was relevant to show that she would be unlikely to engage in the sexual abuse and, therefore, would not have been involved in a plan with Father to kill their baby to cover up the sexual abuse. We disagree.

Initially, we note that the jury failed to convict Jarrell on the CSC charge. As a result, Jarrell's argument that she was prejudiced by the exclusion of McKee's testimony, showing she was less likely to engage in the sexual abuse of a child, is without merit. Jarrell cannot claim to be prejudiced by the exclusion of evidence as it relates to a particular charge when she was not convicted of that charge.[6]

---

6. Although Jarrell was acquitted of CSC conduct charge, she claims the exclusion of Dr. McKee's testimony was still prejudicial because it would have diminished the credibility of the witnesses who testified that Jarrell told them she was involved in the sexual abuse and planning to

*See McCall v. Finley,* 294 S.C. 1, 4, 362 S.E.2d 26, 28 (Ct.App.1987) (stating that this court has long recognized an overriding rule of civil procedure that "whatever doesn't make any difference, doesn't matter").

We further find that McKee's testimony has no relevance to this case. Rule 401, SCRE, allows the admission of evidence which has a tendency to make any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *State v. Hamilton,* 344 S.C. 344, 353, 543 S.E.2d 586, 591 (Ct.App.2001). In this case, Jarrell was alleged to have participated in the sexual abuse of her son. If true, these allegations would have classified Jarrell not as a pedophile, but as an incest abuser. These are two different classifications which require two different sets of proof. "Pedophilia has been defined as 'sexual perversion in which children [in general] are the preferred sex object.'" *State v. Nelson,* 331 S.C. 1, 19, 501 S.E.2d 716, 725, n. 5 (1998) (citation omitted). Incest, however, is sexual abuse relating to kinship between abuser and victim. *See* S.C.Code Ann. § 16–15–20 (Supp.2001). "At least one modern commentator takes the view that the incest offender's chief aberrancy is incest and that, usually, there is no history of other sexually related problems occurring outside the family." *State v. Person,* 20 Conn.App. 115, 564 A.2d 626, 632 (1989).

The Fourth Circuit has recognized the differences in these classifications and how they impact expert testimony. In *U.S. v. Powers,* 59 F.3d 1460 (4th Cir.1995), the court upheld the district court's exclusion of expert testimony claiming to prove the defendant did not fit the "psychological profile of a fixated pedophile," based on the expert's failure to establish relevance to the facts in the case. Powers was charged with statutory rape of his minor daughter, i.e., incest abuse, not with being a fixated pedophile. The court held that "[t]o be relevant, [the

_____

kill her baby. We do not find this argument persuasive. An expert is not necessary for the jury to determine the credibility and truthfulness of the witnesses. *See Duncan v. State,* 232 Ga.App. 157, 500 S.E.2d 603, 608 (1998) (finding profile testimony defendant sought to introduce at trial went to credibility of his own testimony and that jury, without help of expert, could have determined the credibility and truthfulness of all the witnesses and could have formed independent opinions as to defendant's capability to commit acts).

expert's] testimony must show, in a very real way, that because Powers did not share a characteristic common to ... incest perpetrators, he was less likely to be an incest perpetrator himself." *Id.* at 1472. The court noted, however, that had Powers offered evidence showing that those who are not fixated pedophiles are less likely to commit incest abuse, the expert's testimony might have been relevant. Accordingly, the Fourth Circuit found no abuse of discretion in the exclusion of this testimony, finding Powers failed to prove "relevancy 'or a valid scientific connection to the pertinent inquiry' of whether he committed incest." *Id.* at 1472–73; *see also State v. Person*, 564 A.2d at 632 ("Because the defendant never established that his expert witnesses had expertise in areas directly related to intrafamily sexual abuse, the trial court could reasonably have concluded that it was unlikely that their testimony would be of help to the jury."). Because there are significant differences in the identification and diagnosis of incest abusers and pedophiles, we do not feel that McKee's testimony was relevant.

## IV. Admission of the Dildo Into Evidence

At trial, a dildo found in Grenata Blaskey's room during a search of the trailer, was admitted into evidence.[7] At trial, Jarrell objected to the admission of the dildo into evidence on "relevance grounds." On appeal, however, Jarrell argues (1) that pursuant to Rule 403, SCRE, the prejudicial impact of admission of the dildo outweighed its probative value because there was no connection between the dildo and the crime committed, and (2) the admission of the dildo impugned the character and credibility of her mother's testimony. Because Jarrell failed to make these arguments at trial, this issue is not preserved for our review. *See State v. Taylor*, 333 S.C. 159, 174, 508 S.E.2d 870, 877 (1998) (stating an objection which does not specify the particular ground on which the objection is based is insufficient to preserve the question for appellate review); *Holy Loch Distrib., Inc., v. Hitchcock*, 340 S.C. 20, 24, 531 S.E.2d 282, 284 (2000).

---

7. No blood or fingerprints were found on the dildo.

## V. Autopsy Photographs

Jarrell contends the trial court should have excluded autopsy photographs pursuant to Rule 403, SCRE, because their prejudicial impact substantially outweighed their probative value. Specifically, she claims it was not necessary to admit the photographs because the pathologist testified about the cause of death and sexual abuse, and because she offered to stipulate that the baby had been sexually abused. We disagree.

"The relevance, materiality, and admissibility of photographs are matters within the sound discretion of the trial court and a ruling will be disturbed only upon a showing of abuse of discretion." *State v. Rosemond,* 335 S.C. 593, 596, 518 S.E.2d 588, 589–90 (1999). A test to determine whether the trial court abused its discretion is whether the photographic evidence serves to corroborate the testimony of witnesses offered at trial. "If the photograph serves to corroborate testimony, it is not abuse of discretion to admit it." *Id.* at 597, 518 S.E.2d at 590.

The State offered several autopsy photographs arguing the photographs were necessary to corroborate the testimony of the pathologist and show the extent of the baby's sexual abuse. We agree that the photographs were necessary to corroborate the testimony presented at trial. A photograph displaying the anal injuries due to the sexual abuse corroborated both the pathologist's testimony regarding the extent of those injuries and the witnesses' testimony that Jarrell's motive for planning to kill the baby was because the sexual abuse was readily apparent. Significantly, the trial court did not admit all the photographs, giving the State a choice between two photographs depicting the same injury. We find the trial court's exclusion of photographs demonstrates it exercised its discretion. Furthermore, the autopsy photographs corroborated the testimony about the condition of the child. The photographs showed the baby in a state of rigor and in the beginning stages of decomposition and corroborated the pathologist's testimony about the time of death. These photos support the charge against Jarrell of accessory after the fact. We agree with the trial judge, that while some of "the photograph[s] are graphic, the facts of the case are very

graphic" and the photos helped the jury understand the pathologist's testimony. Therefore, under these circumstances, we find the trial court did not abuse its discretion in admitting the autopsy photographs.

## VI. Exculpatory Evidence

██ Finally, Jarrell argues the trial court erred in failing to find that a pending investigation for armed robbery against a State's witness was exculpatory evidence which should have been disclosed to the defense pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We disagree.

Angela Doctor was one of four women incarcerated with Jarrell who testified against her. After Doctor was released from prison, she became a suspect in an armed robbery case. However, at the time of Jarrell's trial, no charges were pending against her and she was unaware that she was a suspect. The State and defense agreed to a hearing in chambers to determine whether the State should have disclosed this information to the defense prior to trial.[8] The trial court found that this information did not need to be disclosed to the defense, ruling it was not exculpatory and could not be used for impeachment purposes.

██ "A *Brady* claim is based upon the requirement of due process. Such a claim is complete if the accused can demonstrate (1) the evidence was favorable to the accused, (2) it was in possession of or known to the prosecution, (3) it was suppressed by the prosecution, and (4) it was material to guilt or punishment." *Gibson v. State,* 334 S.C. 515, 524, 514 S.E.2d 320, 324 (1999) (citations omitted). "Exculpatory evidence is that which creates a reasonable doubt about the defendant's guilt." *State v. Forney,* 321 S.C. 353, 360, 468 S.E.2d 641, 645 (1996). Exculpatory evidence is material only if there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. *Fradella v. Town of Mount Pleasant,* 325 S.C. 469, 479,

---

8. We note that the record indicates the hearing was instigated at the State's request out of concern of a possible appearance that Doctor may have testified with an expectation of leniency if subsequently charged with armed robbery.

482 S.E.2d 53, 58 (Ct.App.1997). A *Brady* violation occurs if a defendant can demonstrate "that favorable evidence could [have been presented] to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (citation omitted).

In this case, we do not believe an investigation of a witness for an uncharged offense creates a reasonable probability that the outcome of the proceeding would have been different had the information been disclosed. Looking at the evidence as a whole, Doctor was one of four women who testified almost identically against Jarrell. Doctor's alleged involvement in an uncharged crime simply has no bearing on Jarrell's guilt. Moreover, the information could not be used for impeachment purposes since an uncharged offense is not probative of the truthfulness of the witness. Thus, we find no error in the trial court's ruling that the State was not required to disclose this information to the defense.

**AFFIRMED.**

CONNOR and SHULER, JJ., concur.