767 S.E.2d 444

The STATE, Respondent,

v.

Donna Lynn PHILLIPS, Appellant.

Appellate Case No. 2012–212663.

No. 5280.

Court of Appeals of South Carolina.

Heard Sept. 10, 2014.

Decided Nov. 12, 2014.

Rehearing Denied Jan. 27, 2015.

Appellate Defender LaNelle Cantey DuRant, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General John Benjamin Aplin, both of Columbia, for Respondent.

FEW, C.J.

A jury convicted Donna Lynn Phillips of homicide by child abuse in connection with the death of her grandson. On appeal, Phillips argues the trial court erred by denying her directed verdict motion because the State's evidence was insufficient to prove her guilt. We affirm.

## I. Facts and Procedural History

On March 17, 2008, the twenty-two-month old victim arrived by ambulance at the emergency department of Baptist Easley Hospital with no heartbeat or pulse. A urine sample collected from the child tested positive for opiates. After doctors

resuscitated the child, he was airlifted to Greenville Memorial Hospital, where he later died. According to the medical examiner, his death resulted from an overdose of hydrocodone—an opiate.

As part of the investigation into the child's death, an officer with the Pickens County Sheriff's Office retrieved from Phillips' home a bottle of Tussionex—a prescription cough syrup—that was prescribed to her. The officer submitted the bottle for chemical testing, and the results indicated the medication contained hydrocodone.

The State indicted Phillips for homicide by child abuse under subsection 16–3–85(A)(1) of the South Carolina Code (2003). The indictment alleged Phillips caused the death of the child "by facilitating or allowing the excessive ingestion of opiate drugs." In addition, the State indicted Latasha Honeycutt—the child's mother—for homicide by child abuse and Jamie Edward Morris—the child's father and Phillips' son—for aiding and abetting homicide by child abuse under subsection 16–3–85(A)(2). The State tried the three co-defendants together.

At the close of the State's case, Phillips moved for a directed verdict, arguing the State failed to prove she gave the child Tussionex or that she did so with the requisite mental state. The trial court denied the motion. The jury convicted Phillips of homicide by child abuse, and the trial court sentenced her to twenty-five years in prison.[1]

## II.  Evidence Presented at Trial

At trial, the State presented the following evidence to prove Phillips' guilt.

### A.  Defendants' Statements Made to Police

Detective Rita Burgess with the Pickens County Sheriff's Office spoke with Morris, Phillips, and Honeycutt at the hospital and subsequently took each of their written statements. According to their statements, the child spent the

---

1.  The jury found Morris guilty of aiding and abetting but acquitted Honeycutt. This court affirmed Morris's conviction. *State v. Morris,* Op. No. 2014–UP–112, 2014 WL 2582751 (S.C. Ct.App. filed March 12, 2014).

weekend with Morris and Phillips. Specifically, Morris and Phillips picked the child up from Honeycutt's home around 2:00 p.m. on Friday, March 14, and returned him to Honeycutt on Sunday around 7:30 p.m. Phillips told Det. Burgess the child "had a runny nose all weekend. . . . [a]nd by Sunday, he was coughing and congested." She claimed Morris gave him children's Tylenol on Sunday afternoon, although she "did not know how much of a dose he had given" the child. Phillips stated that when she and Morris took the child back to Honeycutt's home that evening, the child "was breathing hard" and Morris had to "move[ ] [the child] around in the car seat to try to help his breathing." Phillips claimed she told Honeycutt the child needed to go to the doctor, and that Morris gave Honeycutt the child's Medicaid card and told her "to get him to the doctor" because "his breathing sounded bad."

According to Honeycutt's statements to police, the child returned home Sunday evening and "was extremely sleepy and pitching a fit." She noticed the child "sounded congested" and "had a runny nose." The next morning around 8:00 a.m., Honeycutt changed the child's diaper, during which time the child never awoke. Honeycutt told Det. Burgess she then went back to sleep until approximately 10:00 a.m., when she checked on the child and found him unresponsive. She called out to her boyfriend Brandon Roper, who discovered the child was not breathing. Honeycutt called 911, which phone records confirm occurred at 11:15 a.m. that morning.

Det. Burgess further testified that during the conversation with Phillips at the hospital, Phillips "made random statements" regarding the prescription drug Lortab—a narcotic pain medication containing hydrocodone. Specifically, Phillips told Det. Burgess, "I hope [the child] didn't get any of my Lortab." Phillips also mentioned her sister takes Lortab and "hoped [the child] did not get her sister's Lortab." Moreover, according to Phillips' written statement, Phillips spoke to Brandon Roper at the hospital and told him she had Lortab but "didn't think the child could have gotten it."

Charlie Lark, an investigator with the Pickens County Sheriff's Office, testified about a conversation he had with Morris regarding the child's death. Morris claimed he did not

see Phillips give the child any medication. Morris stated, however, that Phillips had prescriptions for Lortab and cough medicine, specifically Tussionex, that she kept in a basket in her closet. Morris told Lark that Phillips "had a hard time reaching" the basket due to its placement on the top shelf, so he got it down for her twice during the weekend. Although Morris mentioned "the child was playing with the bottles" on one occasion, he told Lark "the tops were on the medication" and "to his knowledge, none of the medication had come out of the bottles."

Lark also testified regarding a conversation he had with Phillips, in which she expressed concern that she "accidentally dropped [a hydrocodone pill] on the floor, and the child could have picked it up." Phillips told Lark, however, she did not see the child "get any medication."

## B. Medical Evidence

Jeffrey Morris Hollifield, a chemist, conducted tests on the liquid in the Tussionex bottle. He testified the tests detected two controlled drug substances in the bottle that were consistent with the two active ingredients in Tussionex—hydrocodone and chloropheniramine. Although the bottle originally contained twelve teaspoons of medication, Hollifield testified a little over eight teaspoons were missing from the bottle.

According to the testimony of Robert Foery, a forensic toxicologist, the child's urine and blood samples revealed the presence of hydrocodone and chloropheniramine. Foery testified the concentration of hydrocodone in the child's blood—102 nanograms per milliliter—was at least two-and-a-half times higher than the therapeutic range recommended for an adult–10 to 40 nanograms per milliliter. In fact, he stated the amount of hydrocodone found in the child's blood would be considered "very high" even for an adult. He further testified the child's death was not the result of a single dose of Tussionex but was caused by receiving multiple doses of the medication. He testified the first dose was probably administered sometime after midnight on Sunday, during the early morning hours. As to whether the child could have died from ingesting Phillips' Lortab, Foery explained that although Lortab contains hydrocodone, it also contains acetaminophen.

Because acetaminophen was not found in the child's blood or urine, Foery concluded the child did not ingest Lortab.

Michael Ward, a forensic pathologist and the chief medical examiner for Greenville County, testified that had the child received medical treatment any time before Sunday night, he would have lived. He also noted the child had a lesion on his lower back, which he testified was a pressure ulcer caused by a lack of blood flow for a period of time. He explained pressure ulcers are common "in comatose patients where they lay in one position for a prolonged time without movement." Dr. Ward also stated the child had "a fairly large amount of firm, knot-like stool," which was consistent with a period of constipation, a side effect of taking hydrocodone. He testified that although it was possible for constipation to result from a single dose of hydrocodone, the degree of constipation indicated the child received multiple doses rather than a single dose. As to the effect hydrocodone would have on the child's behavior, Dr. Ward stated the child would "not have the usual respiratory drive" and would exhibit symptoms of irritability, sleepiness, lethargy, and, ultimately, unconsciousness.

## C. Phillips' Testimony

Phillips testified in her defense. According to her testimony, the child had a "runny nose" on Friday and Saturday but was otherwise "full of life." By Sunday afternoon, however, the child "started crying" and neither she nor Morris "could[ ] console him." Phillips admitted she had a prescription for Tussionex but denied giving any to the child. Specifically, she stated she would "never" give a child medicine not prescribed to him. When asked if Morris gave the child Tussionex, she stated, "No, he wouldn't. I know my son knows better than that."

She further testified she got the basket of medicine down from the shelf in her closet on Saturday morning, and although the child "grabbed a bottle" of medication from it, he did not ingest any of it. She claimed the child could not have accessed the medication without her knowledge because it was stored on the top shelf of her closet.

## D. Other Witnesses' Testimony

Both of Phillips' co-defendants testified at trial. According to Morris's testimony, the child was very active on Saturday and Sunday, although on Sunday he had "a little cough every now and then" and "breathed a little funny." During its case-in-chief, the State presented evidence that on Saturday evening, Morris called and left a voicemail at the DSS office indicating he needed a Medicaid card because the child was sick. Morris testified he called DSS on Saturday because he misplaced the child's Medicaid card, which he later found on Sunday. Morris told the jury he gave the Medicaid card to Honeycutt on Sunday evening and asked her to take him to the doctor. He testified he did not take the child to the doctor over the weekend because he "didn't feel his symptoms were severe enough."

Morris further testified there was not "even a sheer possibility" that the child ingested Tussionex while in his care. Although he admitted retrieving the Tussionex from Phillips' closet on Friday and Saturday, he denied that he or Phillips gave the child any medication, except Tylenol on Sunday afternoon. Kayla Roper—the sister of Honeycutt's boyfriend Brandon-testified, however, that while at the hospital, she overheard Phillips say to Morris that Phillips gave the child some cough medicine over the weekend and "surely to God that's not what is wrong." Brandon also testified that when a nurse told Morris and Phillips that opiates were found in the child's urine sample, Phillips "got [Morris] by the arm and . . . drag[ged] him out the back door of the hospital."

## III. Directed Verdict Motion

In reviewing a denial of a directed verdict, we must view the evidence in the light most favorable to the State. *State v. Jarrell,* 350 S.C. 90, 97, 564 S.E.2d 362, 366 (Ct.App. 2002). If there is any direct evidence of guilt, or if there is substantial circumstantial evidence, that reasonably tends to prove the defendant's guilt, we must find the trial court properly submitted the case to the jury. *State v. Odems,* 395 S.C. 582, 586, 720 S.E.2d 48, 50 (2011); *State v. Rogers,* 405 S.C. 554, 563, 748 S.E.2d 265, 270 (Ct.App.2013).

To convict a defendant of homicide by child abuse, the State must prove (1) the defendant "cause[d] the death of a child . . . while committing child abuse or neglect"; and (2) "the death occur[red] under circumstances manifesting an extreme indifference to human life." § 16–3–85(A)(1). Phillips argues the trial court erred in denying her directed verdict motion because the State failed to present sufficient evidence to prove either of these elements.

## A. The Evidence Proving Child Abuse

A trial court must deny a directed verdict motion when the State presents "any direct evidence" or "substantial circumstantial evidence" to prove the defendant's guilt. *Odems,* 395 S.C. at 586, 720 S.E.2d at 50 (emphasis removed). "Direct evidence is based on personal knowledge or observation and . . ., *if true,* proves a fact without inference or presumption." *Rogers,* 405 S.C. at 563, 748 S.E.2d at 270 (internal quotation marks and citation omitted) (alteration in original). "The presentation of direct evidence 'immediately establishes the main fact to be proved.'" *Id.* (quoting *State v. Salisbury,* 343 S.C. 520, 524 n. 1, 541 S.E.2d 247, 249 n. 1 (2001)). For this reason, the existence of "any direct evidence" proving the defendant's guilt requires the denial of a directed verdict motion. *Odems,* 395 S.C. at 586, 720 S.E.2d at 50. "Circumstantial evidence, on the other hand, is proof of a chain of facts and circumstances from which the existence of a separate fact may be inferred." *Rogers,* 405 S.C. at 563, 748 S.E.2d at 270. If the State relies exclusively on circumstantial evidence to prove guilt, that evidence must be "substantial" to justify denying the motion. *Odems,* 395 S.C. at 586, 720 S.E.2d at 50; *see also Rogers,* 405 S.C. at 565, 748 S.E.2d at 271 ("We find the State's proof that [the defendant] is guilty of murder consisted entirely of circumstantial evidence, and therefore, we review the trial court's decision to deny his directed verdict motion under the 'substantial circumstantial evidence' standard. . . ." (citation omitted)).

The State made no argument at trial as to the existence of direct evidence proving Phillips' guilt. In its appellate brief, the State refers generally to the existence of "substantial evidence." At oral argument, this court asked counsel whether the following testimony from Kayla is direct evidence: "I

heard [Phillips] say that she ... gave the child some cough medicine over the weekend and 'surely to God that's not what is wrong.' " Phillips' counsel responded it was circumstantial evidence because even if the jury believed Kayla's testimony, it would need to assume the "cough medicine" she referred to was Tussionex. The State, responding to the same question, told the court it believed the statement was direct evidence.

We find Kayla's testimony regarding what she heard Phillips say at the hospital is direct evidence of child abuse. Direct evidence is that which requires only the factfinder's determination that the evidence is credible before it may find the existence of a disputed fact. If the jury believed Kayla's testimony, the evidence would "immediately estab-lish[ ] the main fact to be proved"—Phillips gave the child cough medicine. This evidence, when combined with the medical testimony that the cough medicine had to be Tussionex and the child died from receiving multiple doses of it, establishes that Phillips "cause[d] the death of [the] child ... while committing child abuse." § 16–3–85(A)(1); *see also* S.C.Code Ann. § 16–3–85(B)(1) (2003) (defining "child abuse" as "an act ... which causes harm to the child's physical health or welfare"). Therefore, we find the trial court properly denied Phillips' directed verdict motion as it relates to the element of child abuse.[2]

### B. The Evidence Proving Mental State

To prove a defendant guilty of homicide by child abuse, the State must demonstrate the "the death occur[red] under circumstances manifesting an extreme indifference to human life." § 16–3–85(A)(1). Phillips contends that even if

---

2. The State also asserts Phillips' failure to seek medical care after giving the child multiple doses of Tussionex constituted child abuse or neglect. *See* § 16–3–85(B) (defining "child abuse or neglect" as "an act *or omission* by any person which causes harm to the child's physical health," and stating "harm" includes the "fail[ure] to supply the child with adequate ... health care" that causes a "condition resulting in death" (emphasis added)). We need not address this argument because we find the State presented direct evidence that Phillips committed child abuse by giving the child multiple doses of Tussionex. *See State v. Hepburn*, 406 S.C. 416, 428 n. 14, 753 S.E.2d 402, 408 n. 14 (2013) (declining to decide other issues when the determination of one issue was dispositive).

the State proved she committed child abuse by giving the child Tussionex, it failed to prove she acted with extreme indifference to human life. To support her argument, she points to *State v. Jarrell,* in which the court of appeals defined "extreme indifference" as "a mental state akin to intent characterized by a deliberate act culminating in death." 350 S.C. at 98, 564 S.E.2d at 367. She asserts there is no evidence proving she intended to harm the child but, instead, the evidence demonstrates that her "only intent was to the help the child feel better" by giving him medicine.

Subsection 16–3–85(A)(1) does not require the State to prove a defendant acted with the intent to harm in order to prove extreme indifference. Instead, the State must prove the defendant performed a deliberate act that he or she knew would create a risk of death to the child. A deliberate act in the face of such knowledge is a reckless disregard of the risk, and thus demonstrates an extreme indifference to the child's life. *See State v. McKnight,* 352 S.C. 635, 646, 576 S.E.2d 168, 173 (2003) (finding the deliberate ingestion of cocaine in the face of "public knowledge that usage of cocaine is potentially fatal ... was sufficient evidence to submit to the jury on whether [the defendant] acted with extreme indifference to her child's life"); *Jarrell,* 350 S.C. at 98, 99, 564 S.E.2d at 367 (stating "indifference in the context of criminal statutes [is] the conscious act of disregarding a risk which a person's conduct has created" and finding the defendant's deliberate act "created a grave risk of death to her child, evidencing her extreme indifference to his life"). Therefore, to prove Phillips acted with extreme indifference to the child's life, the State was required to prove Phillips intended to give the child Tussionex with the knowledge that doing so would create a risk to the child's life.

With this in mind, we turn to the issue of whether the State's evidence was sufficient to prove this element. We find the record contains direct evidence that Phillips knew giving prescription medication to the child when it was not prescribed to him would put the child's health at risk. In fact, Phillips embraced her own knowledge of this risk in her attempt to show the jury she was not the type of person who would give the child Tussionex:

136

I would never——I was not raised that way. I would never give a child any kind of medicine that was not prescribed for them. I would never give a child anything under the age of two years old. Anybody in my family has better sense. . . .

She continued to make this claim throughout her testimony, stating, "I would never give this medicine or any medicine to [the] child." When asked if Morris gave the child Tussionex, Phillips testified, "No, he wouldn't. I know my son knows better than that. Like I said, my whole family, they had better sense. Nobody gave [the] child anything." We find this testimony to be direct evidence that Phillips knew giving the child her prescription medication created a risk to the health of the child.

Additionally, we find the health risks associated with giving children medications prescribed to adults are a matter of common knowledge. Federal law requires a patient to obtain a prescription for medication that cannot be bought over-the-counter because these medications are "not safe for use except under the supervision of a practitioner licensed by law to administer such drug[s]." 21 U.S.C. § 353(b)(1)(A) (2013). Phillips' bottle of Tussionex contained a label with the following warning: "federal law [provides] that prescribed medications are only for the person they're prescribed to."

The common knowledge of the health risks associated with prescription medication was discussed in *Commonwealth v. Walker*, 442 Mass. 185, 812 N.E.2d 262 (2004). In that case, a jury convicted the defendant of involuntary manslaughter, finding he caused the death of a woman by mixing prescription sleeping medication into her alcoholic drink. 812 N.E.2d at 266. On appeal, the defendant argued the Commonwealth's evidence was insufficient to prove "his conduct posed a high degree of likelihood that substantial harm would result" because the drug was "a legally prescribed medication that has numerous legitimate and 'fairly safe' uses." 812 N.E.2d at 269. The Supreme Judicial Court of Massachusetts rejected his argument, stating, "A person of ordinary intelligence would be aware that there are varying risks associated with all prescription medications. It is a matter of both common knowledge and common sense that a prescription is required to obtain certain medications precisely because they contain drugs that are not safe except when administered and super-

vised by a physician or other properly licensed practitioner." 812 N.E.2d at 271 n. 17.

We understand the direct evidence of Phillips' mental state proves only that she gave the child cough medicine with the knowledge that doing so posed a risk to his *health*. The law requires the State to prove she acted in reckless disregard of a risk of *death*. However, the medical evidence in this case demonstrated that Phillips, knowing the safety risks associated with her conduct, gave the child multiple doses of Tussionex, resulting in a toxic blood level of hydrocodone that was up to ten[3] times higher than the normal range for an adult. In addition, the State presented evidence that Phillips tried to cover up her actions and shift the blame from herself by (1) telling police Morris gave the child Tylenol on Sunday; and (2) suggesting the child could have accidentally ingested Lortab prescribed to her sister or Brandon. *See State v. Martin*, 403 S.C. 19, 26, 742 S.E.2d 42, 46 (Ct.App.2013) ("[A]ny guilty act, conduct, or statements on the part of the accused are ... evidence of consciousness of guilt." (citation omitted)). We also consider the fact that Phillips knew Morris had to "move[ ] [the child] around in the car seat to ... help his breathing" on the way to Honeycutt's home Sunday evening. In addition, Phillips admitted telling Honeycutt the child needed medical attention and that Morris told Honeycutt "to get him to the doctor" because "his breathing sounded bad."

From this combination of direct and circumstantial evidence, a jury could infer Phillips acted with extreme indifference to the child's life. Thus, we find the trial court properly submitted the case to the jury.

## IV. Conclusion

We find the State's evidence supports the trial court's decision to deny Phillips' directed verdict motion. Therefore, her conviction of homicide by child abuse is **AFFIRMED.**

THOMAS and LOCKEMY, JJ., concur.

---

3. Foery testified "the concentration of the drug in the [child's] blood is somewhere between two and a half and five times higher than it should be for a therapeutic [adult] dose." However, the child's level of 102 nanograms per milliliter is actually up to ten times what Foery testified was the "therapeutic range for an adult ... 10 to 40 nanograms per milliliter."