# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Mitchell Rivers, Respondent,

v.

State of South Carolina, Petitioner.

Appellate Case No. 2023-001757

———————————

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

———————————

Appeal From Chesterfield County
Roger E. Henderson, Post-Conviction Relief Judge

———————————

Opinion No. 28285
Heard April 2, 2025 – Filed May 28, 2025

———————————

## REVERSED

———————————

Attorney General Alan McCrory Wilson and Assistant
Attorney General Brian Hollis Gibbs, both of Columbia,
for Petitioner.

Appellate Defender Jessica M. Saxon, of Columbia, for
Respondent.

———————————

**JUSTICE VERDIN:** We issued a writ of certiorari to review the award of post-conviction relief (PCR) to Respondent Mitchell Rivers. Rivers was tried and convicted of Homicide by Child Abuse (HCA) following the death of his four-month-old adoptive child (Victim). At Rivers' trial, the State introduced evidence of Victim's prior injuries that were unrelated to Victim's death. Rivers' attorney at trial (Trial Counsel) objected pretrial but failed to renew that objection during trial, leaving the issue unpreserved on appeal. Following his direct appeal, Rivers filed a PCR application claiming ineffective assistance of counsel. The PCR court denied relief, finding Rivers was not prejudiced by Trial Counsel's error. The court of appeals reversed in an unpublished opinion, holding Rivers was prejudiced by those errors. *Rivers v. State*, Op. No. 2023-UP-261 (S.C. Ct. App. filed July 12, 2023). We now reverse the decision of the court of appeals.

## I.      Factual and Procedural Background

In 2005, Rivers resided with his wife, several family members, and Victim. On the morning of August 7, 2005, Victim died as a result of asphyxiation. On September 19, 2005, after giving several differing statements to law enforcement officers, Rivers was arrested and charged with HCA.

In 2010, before Rivers' trial, the State moved for a preliminary ruling as to the admissibility of evidence of Victim's collateral injuries—the injuries found during Victim's autopsy that were not directly related to Victim's death. Those injuries included contusions of varying age on Victim's scalp, healed rib fractures with old contusions, facial petechiae consistent with asphyxiation, and various external abrasions. In its Motion in Support of Evidence of Abuse, the State argued that "the constellation of injuries is evidence of child abuse and neglect, directly relevant pursuant to SCRE Rule 404(b) to counter the argument of 'mistake or accident.'" The State also argued that this evidence directly countered Rivers' claim that the asphyxiation was accidental, serving as Battered Child Syndrome evidence or evidence from the "same general timeframe as the fatal injury." Rivers, however, moved to exclude the evidence based on lack of a connection between the injuries and Victim's asphyxiation, and no indication that the collateral injuries "have been attributed to the actions of the Defendant by any source at this time." The trial court later denied Rivers' motion, noting that "[t]hese child cases are getting a little different treatment than what we normally are use[d] to involving adult cases and other type of criminal cases." The trial court also noted that Trial Counsel was "protected on the record on that."

At trial, the State called witnesses to explain how Rivers came to care for Victim, the events of the morning of Victim's death, and Victim's collateral injuries. The State first called Dena Owens to explain that Victim was Rivers' wife's nephew but was placed with Rivers and his wife by DSS because Rivers' wife's sister was not fit to care for Victim.

The State also called Wayne Jordan, an investigator with Chesterfield Sheriff's Office, and Julia Duff, a sergeant with Florence Police Department, to testify about Rivers' various statements to police concerning the events on the morning of Victim's death. Jordan and Duff testified that Rivers gave three different stories about the events of August 7, 2005. First, Jordan noted that in his interview with Rivers just after Victim's death, Rivers stated that he shared a bed with Victim on August 7 and woke up with Victim at 6:00 a.m. to change and feed Victim before doing yard work. Rivers stated that after he changed and fed Victim, he placed Victim in a playpen and went outside. Rivers stated that an hour later, his wife came outside to tell him Victim was not breathing. Rivers then went inside to perform CPR on Victim while his wife called 911. Jordan told the jury that the bedroom had been cleaned before police arrived at the scene, making locating the pillow from Victim's playpen impossible.

Duff testified as to the second story Rivers told investigators. Duff stated that she interrogated Rivers after he learned that Victim's autopsy revealed that Victim had an empty stomach on the morning of Victim's death. Duff stated that when faced with this new information, Rivers "confessed that he had done it." Duff summarized Rivers' statements during the interview, noting that Rivers woke to Victim not breathing. Rivers then performed CPR on Victim before placing Victim in his playpen while Victim was still not breathing. Rivers then went outside until his wife retrieved him an hour later to tell him Victim was not breathing. This summary was corroborated by Rick Charles, a senior special agent with SLED, who was also present for Rivers' second statement.

Jordan also testified as to Rivers' final statement to police. In that statement, Rivers said that Victim was not breathing when Rivers woke up at 6:00 a.m.; Rivers performed CPR on Victim until Victim started wheezing and regained color; Rivers then went outside to do yard work; and Rivers' wife got Rivers from the yard when she found Victim not breathing an hour later. After giving this statement, Rivers was arrested and charged with HCA.

Additionally, the State called six witnesses who discussed Victim's collateral injuries. The State called Ron Martin, the paramedic who responded to Rivers'

home on the morning of Victim's death.  Martin testified that Rivers told him Victim had bronchitis in the weeks leading up to Victim's death, causing Victim to have a three-day hospital stay.  Martin then identified several photographs taken after Victim's death.  Martin described bruising "to the back-occipital region of [Victim's] head . . . which [was] consistent with a basilar skull fracture" and "cut [and] slash lacerations . . . in the healing stage . . . on [Victim's] back."  Martin also explained Victim had bruising around his ear and "petechial hemorrhage of eyes" and that Victim could not have sustained these injuries while receiving medical care in the ambulance.

The State next called Dr. Janice Ross, an expert in forensic pathology, who testified about Victim's collateral injuries and cause of death.  Dr. Ross explained she performed the autopsy on Victim and concluded the manner of death was homicide by asphyxiation.  Dr. Ross stated she also discovered "some bruises and some abrasions" in the area of Victim's scalp and "several rib fractures that were healing."  Dr. Ross testified the bruises, abrasions, and fractures were odd because Victim was only four months old and could not "necessarily crawl around and fall off things and cause bruises and abrasions to himself."  Dr. Ross identified the injuries she observed on Victim using a diagram of an infant; she explained she "could see a lot of contusions [and] bruises on the back of the head."  According to Dr. Ross, Victim had "older bruises," which indicated "injuries to the scalp [at] different ages."  Dr. Ross testified the contusions were consistent with blunt force trauma from "a knuckle or fist."  Dr. Ross also identified "old rib fractures" that were "probably at least seven to fourteen days old."

The State then called Dr. Clay Nichols, an expert in forensic pathology.  Dr. Nichols confirmed he reviewed the autopsy report, photographs, and underlying data from Dr. Ross.  Dr. Nichols stated he "agree[d] with Doctor Ross that [Victim] died as a result of asphyxiation due to smothering."  Dr. Nichols explained it was his opinion that Victim "was subjected to physical abuse resulting in multiple rib fractures as well as multiple abrasions and contusions on his body."  According to Dr. Nichols, "the timing of the injuries indicates that these were not the same time, but he was subjected to multiple incidents of blunt trauma."  Dr. Nichols explained Victim had a chest study done two months before he died in which there were "no rib fractures," but then "two months later [Victim had] healing rib fractures."  Dr. Nichols stated Victim had been "physically abused to the point of having multiple rib fractures" and that Victim's contusions "would be non-accidental."  Accordingly, Dr. Nichols testified that this "is a classic case of Battered Child Syndrome."  On cross-examination, Dr. Nichols acknowledged he did not have evidence that Rivers inflicted the prior abuse.  Also, during Dr.

Nichols' testimony, Trial Counsel objected on the grounds that the testimony was cumulative and speculative.  However, Trial Counsel did not raise his pretrial objection to the evidence based on connection.  The State also questioned Jordan, Duff, and Charles about Victim's collateral injuries.

Rivers testified in his defense and stated Victim had difficulty breathing in the weeks before his death.  Rivers explained he and his wife took Victim to the doctor, and Victim was diagnosed with bronchitis.  According to Rivers, Victim's breathing issues persisted, resulting a three-day hospital stay for Victim.  Rivers then reiterated the timeline of events he provided in his final statement to Jordan.  On cross-examination, the State asked Rivers about each of the bruises and contusions Victim had on his body.  Rivers stated he did not know how Victim sustained the injuries.  Rivers also said he had "never [been] alone with [Victim]" because of his work schedule.

Rivers presented testimony from his father, nephew, and two siblings.  Each witness testified they had never seen Rivers mistreat or harm Victim.  At the trial's conclusion, the jury found Rivers guilty of HCA, and the trial court sentenced him to life imprisonment.

Rivers filed an *Anders*[1] brief with the court of appeals, arguing the trial court erred in admitting evidence of prior abuse when the State did not provide evidence Petitioner inflicted the injuries.  After ordering the parties to brief whether the trial court erred in admitting the collateral injury evidence, the court of appeals affirmed the conviction in a published opinion.  *State v. Rivers*, 411 S.C. 551, 769 S.E.2d 263 (Ct. App. 2015).  The court of appeals found the issue of the admission of evidence on collateral injuries unpreserved because Trial Counsel did not renew his pretrial objections.  *Id.* at 553, 769 S.E.2d at 265.

On February 27, 2015, Rivers applied for post-conviction relief, alleging ineffective assistance of counsel.  The PCR court held an evidentiary hearing on July 17, 2017.  Trial Counsel testified his trial strategy was that Rivers "didn't have to care [for Victim] all the time . . . [and] the State couldn't prove that he had done anything to cause [Victim] to die . . . ."  Trial Counsel noted that he believed the trial court's pretrial ruling was final and claimed the ruling "substantially hindered . . . [Rivers'] defense."  Trial Counsel also acknowledged he "had to object contemporaneously to preserve the issue" and that his decision not to object at trial was "a mistake."

---

[1] *Anders v. California*, 386 U.S. 738 (1967).

By order filed October 19, 2017, the PCR court denied and dismissed Rivers' PCR application. The PCR court found that Trial Counsel's failure to renew a pretrial objection was deficient representation. However, the court found that Rivers "suffered no prejudice because the evidence was properly admitted to the jury." The PCR court explained that the collateral injuries "were highly probative to the question of whether or not the four-month-old's death was an accident, as was and still is argued by" Rivers. The PCR court also found that Rivers' "own statements and testimony established the extreme indifference necessary to convict him for [HCA]."

Rivers sought a writ of certiorari of the PCR court's decision from this Court. We transferred the matter to the court of appeals, which granted certiorari. The court of appeals reversed in an unpublished opinion, *Rivers*, Op. No. 2023-UP-261, finding that Trial Counsel was deficient for failing to renew the pretrial objection and that Rivers was prejudiced by that deficient performance because there was no "nexus between the collateral evidence and the circumstances surrounding Victim's death such that logical relevance may be established to prove intent." The State then petitioned this Court for a writ of certiorari, which we granted.

## II.    Standard of Review

When reviewing a PCR decision, we defer to the "PCR court's findings of fact and will uphold them if there is evidence in the record to support them." *Smalls v. State*, 422 S.C. 174, 180, 810 S.E.2d 836, 839 (2018) (citing *Sellner v. State*, 416 S.C. 606, 610, 787 S.E.2d 525, 527 (2016)). However, "questions of law [are reviewed] de novo, with no deference to trial courts." *Id.* at 180–81, 810 S.E.2d at 839 (citing *Sellner*, 416 S.C. at 610, 787 S.E.2d at 527). Thus, we "will reverse the PCR court only where there is either no probative evidence to support the decision or the decision was controlled by an error of law." *Edwards v. State*, 392 S.C. 449, 455, 710 S.E.2d 60, 64 (2011).

## III.    Discussion

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. *Taylor v. State*, 404 S.C. 350, 359, 745 S.E.2d 97, 101 (2013). To establish ineffective assistance of counsel, "a PCR applicant must prove: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the applicant's case." *Leon v. State*, 379 S.C. 448, 450, 666 S.E.2d 260, 261 (Ct. App. 2008) (citing *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984); *Cherry v. State*, 300 S.C. 115, 117, 386 S.E.2d 624, 625 (1989)).  A "PCR applicant has the burden of proving both prongs." *Caprood v. State*, 338 S.C. 103, 109, 525 S.E.2d 514, 517 (2000).  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.  Because we find Rivers has not satisfied the prejudice prong, we need not address whether his trial counsel's performance was deficient.  *Id.* at 697 ("[I]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").

### a.  Prejudice

Rivers argues that the collateral injury evidence constituted improper propensity evidence that, if excluded, could reasonably have led to a different result at trial.  We disagree.

To establish prejudice, a PCR applicant must show "a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Ard v. Catoe*, 372 S.C. 318, 331, 642 S.E.2d 590, 596 (2007) (quoting *Strickland*, 466 U.S. at 695).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Taylor*, 404 S.C. at 359, 745 S.E.2d at 102 (quoting *Strickland*, 466 U.S. at 694).  In making the prejudice determination, a court must "consider the totality of the evidence before the jury." *Jones v. State*, 332 S.C. 329, 333, 504 S.E.2d 822, 824 (1998).  In all events, there is no reasonable probability of a different result if the evidence of guilt is overwhelming. *Geter v. State*, 305 S.C. 365, 367, 409 S.E.2d 344, 346 (1991).

We first note that "an issue that was raised on direct appeal but found to be unpreserved may be raised in the context of a PCR claim alleging ineffective assistance of counsel." *McHam v. State*, 404 S.C. 465, 475, 746 S.E.2d 41, 47 (2013).  Because there can be no prejudice where the merits of an issue would have been resolved against the PCR applicant, "an examination of the merits of the issue is appropriate in analyzing the prejudice prong in [a] PCR claim." *Id.*  However, at oral argument, the State conceded that we need not determine whether the evidence was admissible.  Thus, we do not reach whether the collateral injury evidence was admissible under Rule 404(b) of the South Carolina Rules of Evidence (SCRE) as *res gestae* evidence, or as Battered Child Syndrome evidence.[2]

---

[2] Though we do not reach this question, we note that the admissibility of Battered Child Syndrome evidence is not a given in any case.  Its admissibility first depends

As to whether excluding the collateral injury evidence would have affected the jury's verdict, we find no reasonable probability that it would have. Section 16-3-85(A)(1) of the South Carolina Code (2015) provides "A person is guilty of [HCA] if the person: (1) causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life . . . ." "Extreme indifference is

_____

upon the purpose for which the evidence is offered. The purpose for which the evidence is offered must be relevant. Under Rule 401, SCRE, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." For example, we held in *State v. Lopez*, 306 S.C. 362, 367, 412 S.E.2d 390, 393 (1991), that this evidence is admissible through expert testimony to show the child's injuries were not accidental. Next, the trial court must conduct a Rule 403 analysis. *See* Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). In addition, the proponent of the evidence must establish the elements of the syndrome. *See People v. Jackson*, 95 Cal. Rptr. 919, 921(Cal. Ct. App. 1971) (listing the elements that are the criteria for the "battered child syndrome" as "(1) the child is usually under three years of age; (2) there is evidence of bone injury at different times; (3) there are subdural hematomas with or without skull fractures; (4) there is a seriously injured child who does not have a history given that fits the injuries; (5) there is evidence of soft tissue injury; (6) there is evidence of neglect."). Further, if the evidence is offered not to show that the injuries were non-accidental, but instead to prove the defendant was the abuser, a Rule 404, SCRE, analysis is required. As we explained in *Lopez*, Battered Child Syndrome evidence is admissible only to support an inference that the injuries were not accidental, not to prove the defendant committed prior abuse. *See Lopez*, 306 S.C. at 367, 412 S.E.2d at 393; *State v. Fletcher*, 379 S.C. 17, 23, 664 S.E.2d 480, 483 (2008) (reaffirming that Rule 404(b), SCRE, requires the State to show either a prior conviction or prove the prior bad act by clear and convincing evidence because Rule 404 evidence asserts directly that the defendant has acted wrongly in the past). We also note that in this case, the defense did not seek, nor did the trial court provide, a limiting instruction to the jury regarding the use of Battered Child Syndrome evidence. The trial court should give a limiting instruction upon request.

in the nature of 'a culpable mental state . . . and therefore is akin to intent.'" *State v. Jarrell*, 350 S.C. 90, 98, 564 S.E.2d 362, 367 (Ct. App. 2002) (alteration in original) (quoting *State v. Vowell*, 634 S.W.2d 118, 119 (Ark. 1982)). In proving extreme indifference, the State is not required "to prove a defendant acted with the intent to harm" but must show the "defendant performed a deliberate act that he or she knew would create a risk of death to the child." *State v. Phillips*, 411 S.C. 124, 135, 767 S.E.2d 444, 449 (Ct. App. 2014), *aff'd as modified*, 416 S.C. 184, 785 S.E.2d 448 (2016).

Our courts have found extreme indifference based on omission in extraordinary circumstances. *See State v. Thompson*, 420 S.C. 192, 208-09, 802 S.E.2d 623, 631 (Ct. App. 2017) (finding extreme indifference where a mother failed to help her child though that child was bleeding through his shirt and that a juror could reasonably infer that either parent beat Victim while the other parent was present and acquiesced in the abuse); *Jarrell*, 350 S.C. at 99, 564 S.E.2d at 367 (finding extreme indifference where a mother left her child at her residence knowing he would be killed). Even so, extreme indifference does not require extraordinary facts—only that the defendant was aware of the risk of death and disregarded it. *Phillips*, 411 S.C. at 135, 767 S.E.2d at 449.

Here, Rivers testified that he found Victim unresponsive and performed CPR until the child began wheezing and regained color. Despite Victim's history of severe respiratory issues and recent hospitalization, Rivers placed Victim face down in a playpen without seeking medical assistance or informing anyone and then went outside to do yard work. When Victim stopped breathing again, Rivers—who admitted he did not know CPR—had to be guided by 911 operators in his efforts to resuscitate Victim. Victim's autopsy confirmed that Victim died of asphyxiation.

Rivers' awareness of Victim's medical history, Victim's need for CPR, Rivers' inability to perform CPR, and Rivers' failure to seek assistance after Victim resumed wheezing demonstrated a conscious disregard for the risk of Victim's death. Thus, even assuming the jury accepted Rivers' version of events, his actions established extreme indifference beyond a reasonable doubt. Moreover, the jury could have found Rivers' testimony non-credible and reached an even more unfavorable conclusion as to what happened on the morning of Victim's death.

Accordingly, Rivers has not demonstrated a reasonable likelihood that excluding the collateral injury evidence would have changed the jury's verdict and has failed to satisfy *Strickland's* prejudice prong. *See Ard v. Catoe*, 372 S.C. 318, 331, 642 S.E.2d 590, 596 (2007) (stating that to establish prejudice, a PCR applicant must

show "a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt" (quoting *Strickland*, 466 U.S. at 695)); *Strickland*, 466 U.S. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."). The court of appeals' decision is therefore

**REVERSED.**

**KITTREDGE, C.J., FEW, JAMES, JJ., and Acting Justice Daniel McLeod Coble, concur.**