675 S.E.2d 764

**The STATE, Respondent,**

**v.**

**Jomer HILL, Appellant.**

**No. 4507.**

Court of Appeals of South Carolina.

Heard Jan. 8, 2009.

Decided Feb. 24, 2009.

Rehearing Denied May 5, 2009.

---

Deputy Chief Appellate Defender for Capital Appeals Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Melody J. Brown, of Columbia; and Solicitor Robert Mills Ariail, of Greenville, for Respondent.

KONDUROS, J.:

Jomer Hill appeals his murder convictions arguing the trial court erred in admitting testimony of a police informant who was allowed to invoke the Fifth Amendment on cross-examination. Hill further contends the trial court erred in failing to give a jury instruction permitting the jury to draw an adverse inference from the informant's refusal to answer questions and in denying his motion for mistrial based on the solicitor's closing argument. We affirm.

## FACTS

Hill was convicted and sentenced to fifty years' imprisonment for the murders of Ken Goldsmith and Trey Brown in December of 2000. The lengthy trial produced numerous witnesses who testified to a drug-selling operation in which Trey Brown and Hill sold drugs for a man named Mont Brown. The victims were discovered shot in a liquor house [1] frequented by all of the aforementioned parties.

Witnesses observed Hill and Mont Brown having a serious private discussion at the liquor house the day before the murders. Witnesses also testified Trey Brown had a confrontation with Mont Brown the night before the murder regarding the division of profits from drugs Trey had sold.

Antone Jones testified he sold drugs for Mont Brown and as a member of the organization you were responsible for any other members you brought into the business. Jones stated Mont Brown had instructed him to kill his own cousin when the cousin was arrested. Jones testified Hill had brought Trey Brown into the business.

The mother of Hill's child, Chasaity Drummond, testified she was at Hill's mother's house picking up her child the morning after the murders. Hill went inside, changed his clothes, and asked Drummond to throw away a bag for him on her way out. Hill cautioned Drummond she should not throw the bag away at her home.

Maxie Wright, a former, long-time boyfriend of Hill's mother,[2] testified Hill told him Mont Brown had threatened to kill Hill's entire family if Hill did not kill the victims. Wright also testified Hill maintained his innocence.

The most damaging testimony against Hill was elicited from a police informant, Timothy Paden. Paden testified Hill had confessed to him while they were both in the Greenville County Detention Center. Paden further testified regarding a recording he later made of Paden allegedly confessing to the

---

1. The liquor house was a house located at 18 Chestnut Street in Greenville where visitors gambled, drank, sold drugs, socialized, played video games, and watched television.

2. The woman is actually his grandmother, but she raised Hill and their relationship was that of mother and son.

crime.[3] On cross-examination, Paden refused to answer questions regarding a plea agreement he had made with federal authorities on an apparently unrelated drug charge. The federal authorities discovered Paden had provided false information to them regarding a murder in an effort to have his sentence reduced. Paden told the federal authorities Mont Brown murdered another drug dealer, Andre Rosemond, because Rosemond had kidnapped Mont Brown's wife and child. Paden failed a polygraph examination and confessed to fabricating this story. When his dishonesty was discovered, the federal judge sentenced Paden to twenty years.

The trial court determined the specific details of the violated plea agreement were collateral to Hill's case thus, Hill's right to cross-examine Paden was not impermissibly limited by Paden's invoking the Fifth Amendment on questions relating to the failed agreement and Mont Brown. Furthermore, the State agreed, with some prodding from the trial court, to stipulate Paden had previously provided false information to federal authorities in order to receive a reduced sentence.

Paden answered in the affirmative when asked if he had violated a plea agreement that required his cooperation and his honesty. Furthermore, upon cross-examination, Paden admitted to having criminal convictions of his own and to reporting crimes in exchange for the reward money available through the Crimestoppers program. At the conclusion of all testimony, Hill requested a jury instruction that jurors may infer a witness's answer to a question would be adverse if that witness invoked the Fifth Amendment. The trial court refused the instruction.

In closing arguments, the State attempted to neutralize the defense's emphasis on Mont Brown's role in the case by pointing out that Hill was the only person on trial before this jury. The solicitor stated "the issue before you is not the culpability of Demetrius Lamont Brown [Mont Brown]. The only issue before you ladies and gentlemen, according to your oath, is whether this defendant, Jomer Hill, is guilty of the

---

3. The record contains a transcript of the tape prepared by the State and provided to the jury to aid in their understanding of the recording. In the transcript, Hill purportedly answers in the affirmative several times when Paden asks if Hill was alone when he shot Trey and Ken.

murders of Trey Brown and Ken Goldsmith." The solicitor later stated "[w]hy isn't anybody else in here with him? Number one, he's the only person that's within your province to consider." The defense then objected and the discussion relating to the objection was later placed on the record arguing the last statement by the solicitor commented on Hill's failure to put up a defense and call witnesses. The court took the defense's argument and motion for mistrial under advisement and later determined the comment was meant to focus the jury on the question of Hill's innocence or guilt as opposed to Mont Brown's culpability and did not, in context, unfairly comment on Hill's right not to testify. This appeal followed.

## LAW/ANALYSIS

### I. Paden's Testimony

■ Hill argues the trial court erred in admitting Paden's testimony regarding the victims' murders and permitting Paden to refuse to answer certain questions on cross-examination. We disagree.

■ The right of a defendant in a federal court to confront the witnesses against him, guaranteed by the Sixth Amendment, includes the right to test the truth of those witnesses' testimony by cross-examination. *U.S. v. Cardillo*, 316 F.2d 606, 610 (2nd Cir.1963). This right is also guaranteed by our State constitution. *See State v. Nest Egg Soc. Today, Inc.*, 290 S.C. 124, 130, 348 S.E.2d 381, 385 (Ct.App. 1986).

> The importance of cross-examination in our jurisprudence has been well stated by Professor Wigmore: "It is beyond any doubt the greatest legal engine ever invented for the discovery of truth. However difficult it may be for the layman, the scientist, or the foreign jurist to appreciate this, its wonderful power, there has probably never been a moment's doubt upon this in the mind of a lawyer of experience."

*Cardillo*, 316 F.2d at 610–11 (quoting 5 Wigmore, Evidence § 1367 (3d ed.1940)). Nevertheless, "[t]he trial court retains discretion to 'impose reasonable limits on [the scope] of cross-

examination designed to show the prototypical form of bias on the part of a witness.'" *State v. Graham,* 314 S.C. 383, 385–86, 444 S.E.2d 525, 527 (1994) (citations omitted).

■ The seminal case on this issue is *Cardillo,* 316 F.2d at 610. In *Cardillo,* the court discussed the scenarios that could occur when a witness is presented to testify against a defendant and allowed to plead the Fifth Amendment on cross-examination.

> Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him. On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part.

*Id.* at 611. Questions on cross-examination are collateral if they relate solely to the witness's credibility and bear no relation to the subject matter of the direct examination. *Id.*

On direct examination, Paden testified primarily to the contents of his taped conversation with Hill in which Hill answered "yeah" to the question of whether he was alone when he shot Trey and Ken. Paden testified about the events surrounding the making of that tape, and he testified about his past police informant activities and rewards he had received through the Crimestoppers program. The State questioned Paden regarding his current incarceration on drug charges and the violated plea agreement.

> Q. Last question, Mr. Paden.... First of all, did you enter into some kind of an agreement with the Federal Government?
>
> A. Yes, sir.
>
> Q. And was it the position of the Federal Government that you violated the terms of that agreement, with particularity toward your honesty?
>
> A. Yes, sir, but due to my appeal I'm not even allowed to discuss it, sir.

From the record, it appears Hill sought to elicit more details from Paden regarding the specifics of his dishonesty in his federal deal.[4] However, under *Cardillo* such information is collateral to Paden's direct testimony in the case *sub judice*. The specifics of the failed plea agreement bear on Paden's credibility. Nothing in the record suggests any of the proposed questions Paden failed to answer would have related to his direct testimony. Paden's credibility issues were put before the jury through direct and cross-examination. Consequently, Paden's refusal to address collateral matters did not prejudice Hill, and the admission of Paden's direct testimony was proper.

## II. Jury Instruction

Hill contends the trial court erred in refusing to give the requested jury charge that "if [a] witness takes [the] fifth or refuses to testify you the jury may infer that the answer would be adverse." We disagree.

■ "Generally, the trial judge is required to charge only the current and correct law of South Carolina." *State v. Zeigler*, 364 S.C. 94, 106, 610 S.E.2d 859, 865 (Ct.App.2005). If a charge is substantially correct and covers the law there is no need for reversal. *Id.* To warrant reversal, the refusal to give a requested charge must be erroneous and prejudicial to the defendant. *Id.*

■ In the instant case, Hill submitted his request with no supporting authority, and we are unable to find any that supports the giving of this charge. In fact, "[i]t is desirable the jury not know that a witness has invoked the privilege against self-incrimination since neither party is entitled to draw any inference from such invocation." *State v. Hughes,* 328 S.C. 146, 150, 493 S.E.2d 821, 823 (1997) (discussing instances in which a witness is presented solely for the purpose of invoking the Fifth Amendment in front of the jury and

---

4. Hill argued Paden was "dodging" him about lying about another murder case by "hiding behind the Fifth Amendment." Hill further contended Paden is "sitting here trying to put my client's feet in the fire and yet he wants to dodge being cross-examined about his prior—his prior lies...."

referencing "general rule that no adverse inference may be drawn from witness' assertion of the privilege").

Furthermore, the given jury charge was substantially correct and covered the applicable law. The trial court instructed "[y]ou may also consider the appearance, the manner of the witness while on the stand. Was he or she straightforward or hesitant in answering?" and whether "there was some reason a witness would want to give testimony which would help or hurt one side or the other." These instructions informed the jury that it is the judge of credibility and it could consider Paden's hesitancy in responding to questions on cross-examination. Therefore, we find the trial court did not err in refusing to give the requested charge, and Hill was not prejudiced thereby.

### III. Solicitor's Closing Remarks

Finally, Hill contends the trial court erred in denying his motion for mistrial because the solicitor improperly commented on Hill's right to remain silent and not present a defense. We disagree.

The trial court has discretion to grant or deny a motion for mistrial, and the court's decision will not be disturbed on appeal absent an abuse of discretion amounting to an error of law. *State v. Culbreath*, 377 S.C. 326, 331, 659 S.E.2d 268, 271 (Ct.App.2008). A mistrial should be granted only when absolutely necessary. *State v. Council*, 335 S.C. 1, 13, 515 S.E.2d 508, 514 (1999). To receive a mistrial, a defendant must show both error and resulting prejudice. *Id.*

"[I]t is impermissible for the State to comment directly or indirectly upon a defendant's failure to testify at trial." *State v. Adkins*, 353 S.C. 312, 319, 577 S.E.2d 460, 464 (Ct.App.2003). "However, even improper comments on a defendant's failure to testify do not automatically require reversal if they are not prejudicial to the defendant." *Gill v. State*, 346 S.C. 209, 221, 552 S.E.2d 26, 33 (2001). The defendant must show the improper comment deprived him of a fair trial. *Id.* Additionally, a curative instruction emphasizing the jury cannot consider the defendant's failure to testify will cure any potential error. *Id.*

 When examined in context, we do not believe the solicitor's comment unfairly commented on Hill's right to remain silent. As seen throughout the record, part of the defense strategy was to place direct or indirect responsibility for the murders on Mont Brown. Therefore, the solicitor emphasized that only Hill was on trial and before the jury, and its task was to determine whether or not he alone was guilty. Furthermore, the trial court instructed the jury the defendant's silence could not be considered "in any manner whatsoever" and the defendant has no burden of proof and is not required to prove his innocence. Therefore, even if the solicitor's comment was improper, the trial court's jury instruction should be deemed to have cured any error or prejudice that may have resulted from it.

Based on the foregoing, the ruling of the trial court is

**AFFIRMED.**

HEARN, C.J., and SHORT, J., concur.