782 S.E.2d 414

**Jomer HILL, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

Appellate Case No. 2012–212398.
No. 5380.

Court of Appeals of South Carolina.

Heard Oct. 13, 2015.

Decided Feb. 10, 2016.

424

Appellate Defender, Susan Barber Hackett, of Columbia, for petitioner.

Attorney General, Alan McCrory Wilson and Senior Assistant Deputy Attorney General, Karen Christine Ratigan, both of Columbia, for respondent.

GEATHERS, J.

Jomer Hill (Petitioner) appeals the denial of post-conviction relief (PCR), arguing the PCR court erred in declining to find appellate counsel ineffective for failing to raise a directed verdict issue on appeal. We affirm.

## FACTS/PROCEDURAL HISTORY

In December of 2000, Kenneth Goldsmith and Clifton "Trey" Brown (Trey) were shot at a "liquor house" where locals regularly visited to buy drugs, drink alcohol, gamble, and socialize. Goldsmith died at the scene and Trey was transported to a hospital where he later died. The case became a cold case when investigators were unable to identify a suspect. Officers sought to reopen the case by seeking additional evidence and interviewing new witnesses. The officers observed some hesitancy in the community members' willingness to give information, stemming from their fear of Lamont "Mont" Brown (Brown),[1] a known drug dealer and leader of a large drug enterprise. Of his own volition, Timothy Paden[2] contacted investigators and alleged Petitioner confessed to the crimes. Paden offered to wear a wire and subsequently recorded Petitioner's confession. Thereafter, in 2005, a grand jury indicted Petitioner for the murders, and he proceeded to trial.

Trial testimony revealed that the liquor house was actually Goldsmith's residence and he received a portion of gambling proceeds generated at the home. Goldsmith gave Trey a key to the home and allowed him to operate the liquor house because of their friendship. Trey and Petitioner were reputed drug dealers and sold drugs for Brown from the liquor house; moreover, it was Petitioner who introduced Trey to Brown and the organization. One former member of the organization testified that the individual who introduces a new potential drug dealer to Brown becomes responsible for the actions of the person whom he brought into the organization. This

---

1. Trey Brown and Lamont Brown are not related.

2. Paden, Trey, and Petitioner were members of Brown's drug organization and the group held regular business meetings regarding the organization.

former member further explained Brown ordered him to kill the former member's own cousin because the cousin "snitched" and Brown "don't like no snitches."

Witnesses testified that just prior to his death, Trey mentioned he had "to pay some bills" to Brown and Brown was "sweating" him for money. Also, Brown testified that a few days prior to the murders, Brown warned Petitioner that he "was getting tired of him, you know, not making his payments on time" and that he "was going to be kicked out of the [drug organization] ... if he didn't get his stuff together and start coming to bring his money in on time like Trey was." Further, Brown testified that prior to his death, Trey was "moving up" in the organization because he began to do "extra stuff" for Brown such as transporting drugs. In contrast, Petitioner was "on his way down, way down by then."

On the night before the crimes, several individuals were gambling and socializing at the liquor house, including Trey, Petitioner, and Goldsmith. At some point, Brown arrived and stood outside looking for Trey and Petitioner, expecting payment from both of them for drugs. According to Brown, both men informed him they would give him the money later that evening; however, neither returned with the money. Several witnesses testified they observed Brown and Trey argue about money because Brown wanted the money Trey owed him. One witness observed Trey and Brown have a conversation that was "probably serious because they didn't want anybody to hear their discussion." Another witness observed Trey go outside of the liquor house to give Brown money and Brown responded "that ain't right ... I want it all." During the argument, Trey cursed at Brown, stated "that's my half," and ran back into the liquor house. Once back inside, Trey spoke with Petitioner; Petitioner then went outside to speak with Brown.

Trey's girlfriend testified that on the morning of the crimes, Trey's pager went off at around 9:50 a.m. and he went upstairs to return the call. Phone records indicate that on that morning, Petitioner paged Trey at 9:39 a.m. and Trey placed a call to Petitioner five minutes later—the last recorded outgoing call on Trey's phone. After the call, Trey hurriedly grabbed a large sum of money and left the home. Trey's girlfriend

testified Trey left to go to the liquor house. On cross-examination, however, she admitted she "didn't know for sure" if Trey went to the liquor house, "but that was his usual hangout."

According to the mother of Petitioner's child, sometime before noon on the morning of the crimes, while she was at Petitioner's home, Petitioner ran into the home, sweating and out of breath. He changed clothes, and as she was leaving, asked her to throw away a black trash bag for him. He cautioned her to make sure she did not throw the bag away at her house. She followed his directions without looking inside the bag.

At around 5:00 or 6:00 p.m. on the evening of the murders, investigators arrived at the crime scene and did not find any evidence of forced entry. Both Goldsmith and Trey were discovered in the same bedroom of the home. Goldsmith suffered two gunshot wounds to the chest, one being a rapidly fatal wound. Trey suffered a gunshot wound to the back of the skull. An expert opined both Goldsmith and Trey remained in the liquor house for approximately seven or eight hours before they were discovered. Accordingly, the pathologist opined they were shot between 9:00 a.m. and 12:00 p.m. An officer testified ballistic fingerprints from the bullet projectiles discovered at the crime scene showed all the bullets were fired from the same gun and both Goldsmith and Trey were shot with a .38 caliber gun.

Although no witness placed Petitioner at the crime scene at the time of the crimes, individuals saw Petitioner in the general vicinity of the liquor house between 9:00 a.m. and 12:00 p.m. on the day of the crimes. Along with the mother of Petitioner's child, other witnesses testified they noticed Petitioner changed outfits that morning and he never again wore the same outfit he wore between 9:00 a.m. and 12:00 p.m. that morning.

## I. Confessions or Admissions of Essential Facts

Paden testified he and Petitioner were incarcerated together[3] when Petitioner confessed to committing the murders.

---

**3.** Although the record suggests Paden was incarcerated for an unrelated matter, the record is not clear that the reason for Petitioner's incarcera-

He stated he and Petitioner discussed a double homicide, and given the nature of the conversation, Paden concluded Petitioner murdered Goldsmith and Trey. After his release, Paden contacted law enforcement and reported Petitioner's confession. Thereafter, Paden sought "concrete evidence" of the confession by audio-recording a conversation with Petitioner. The audio recording was played for the jury while the jury reviewed a transcript of the recording. The record provided for this appeal does not include a copy of the transcript. However, in Petitioner's direct appeal, Petitioner included a transcript of the taped recording in the record. The opinion disposing of the direct appeal noted "[i]n the transcript, [Petitioner] purportedly answers in the affirmative several times when Paden asks if [Petitioner] was alone when he shot Trey and [Goldsmith.]" *State v. Hill*, 382 S.C. 360, 365 n. 3, 675 S.E.2d 764, 767 n. 3 (Ct.App.2009).

According to Brown, on the morning of the crimes, Petitioner arrived at Brown's house between 9:30 and 10:00 a.m. and Brown asked why Trey did not come with Petitioner. Petitioner responded "he was gone" and "kind of made the sign of a gun." Brown asked, "What?" and Petitioner responded, "man, it was just over with." According to Brown, Petitioner elaborated that Trey had "used him" and "made him look bad" in front of Brown. Petitioner also stated "it was crunch time and [he] did what [he] had to do." Brown understood their conversation to mean Petitioner shot Trey. Brown opined Petitioner shot Trey because: he was jealous of Trey; Petitioner was using some of the drugs they were supposed to sell; and he felt Trey betrayed him. Brown also testified that while at the hospital visiting Trey before Trey died, Petitioner told Brown he shot Trey because Trey "didn't help him when he was in a bind with" Brown and Trey had already paid off his debts to Brown.

At trial, Maxie Wright, the longtime boyfriend of Petitioner's grandmother,[4] denied telling investigators Petitioner confided in him that Brown directed Petitioner to murder Trey.

---

tion was related to the instant murders. Both were subsequently released from incarceration prior to trial of the instant matter.

4. Petitioner's grandmother raised him and their relationship was that of mother and son.

Wright also stated Petitioner denied killing Trey and Gold-smith. However, an officer testified Wright had previously stated Petitioner told Wright that Brown "made him do it; that [Brown] had told him if he didn't do it, he would kill his whole family."

After the State rested, Petitioner moved to dismiss the indictments and for a directed verdict, arguing the only evidence connecting him to the two murders was an alleged confession and South Carolina law requires more than a confession to convict him of the crimes. Petitioner argued the State did not present sufficient evidence corroborating Petitioner's confession to establish the *corpus delicti* of the two murders. The trial court denied the directed verdict motion, finding there was evidence in addition to Petitioner's confession to establish the *corpus delicti*. The jury convicted Petitioner as indicted. Petitioner moved for a judgment notwithstanding the verdict, arguing the record did not include any evidence proving Petitioner committed the crimes aside from his alleged confession. The trial court construed the motion as a motion for a new trial, which it denied. The trial court sentenced Petitioner to concurrent sentences of fifty years' imprisonment for each crime.

Petitioner appealed. During the appeal process, Petitioner wrote to appellate counsel, encouraging him to brief the *corpus delicti* directed verdict issue. Appellate counsel did not brief the issue.

## II. PCR

Ultimately, this court affirmed the convictions and sentences. *See Hill,* 382 S.C. at 370, 675 S.E.2d at 769. Petitioner filed a pro se petition for certiorari to the South Carolina Supreme Court, which was dismissed. Petitioner filed a petition for PCR arguing, among other things, ineffective assistance of appellate counsel for failure to raise the directed verdict issue on appeal.

During the PCR hearing, Petitioner argued the only evidence the State had to convict him was his alleged wiretapped confession to Paden. He maintained appellate counsel erred in failing to brief the directed verdict issue on appeal as there was insufficient evidence to support a conviction. Trial coun-

sel testified that he believed the State would not have proceeded to trial without Petitioner's wired conversation with Paden. He explained that he argued the directed verdict issue at trial; therefore, it was preserved.

The PCR court found Petitioner failed to meet his burden of proving appellate counsel was deficient. The court noted Petitioner did not present testimony from appellate counsel; therefore, it could not speculate as to why appellate counsel briefed the three issues outlined in the appeal but not the directed verdict issue. Further, the PCR court found Petitioner failed to prove prejudice because the State "presented overwhelming evidence of guilt—including three independent witnesses who testified [Petitioner] had admitted his guilt to them." Accordingly, the PCR court denied PCR. This appeal followed.

## ISSUE ON APPEAL

Did the PCR court err in declining to find appellate counsel was ineffective for failing to appeal the denial of the motion for a directed verdict?

## STANDARD OF REVIEW

"In [PCR] proceedings, the burden of proof is on the applicant to prove the allegations in his application." *Bennett v. State*, 383 S.C. 303, 307, 680 S.E.2d 273, 275 (2009). "If the PCR court's finding is supported by any evidence of probative value in the record, it should be upheld." *Id.*

## LAW/ANALYSIS

Petitioner maintains the PCR court erred in declining to grant PCR. Specifically, Petitioner argues appellate counsel's failure to raise the directed verdict issue on appeal violated his Sixth Amendment right to effective assistance of appellate counsel. We disagree.

"A defendant is constitutionally entitled to the effective assistance of appellate counsel." *Southerland v. State*, 337 S.C. 610, 615, 524 S.E.2d 833, 836 (1999). "However, appellate counsel is not required to raise every nonfrivolous issue that is

presented by the record." *Thrift v. State,* 302 S.C. 535, 539, 397 S.E.2d 523, 526 (1990).

> There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review. This has assumed a greater importance in an era when oral argument is strictly limited in most courts—often to as little as [fifteen] minutes—and when page limits on briefs are widely imposed.

*Jones v. Barnes,* 463 U.S. 745, 752–53, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). "Notwithstanding Barnes, it is still possible to bring a *Strickland* [*v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)] claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins,* 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

■ To prevail on an ineffective assistance of appellate counsel claim, "[f]irst, the burden of proof is upon petitioner to show that counsel's performance was deficient as measured by the standard of reasonableness under prevailing professional norms." *Southerland,* 337 S.C. at 616, 524 S.E.2d at 836. "Second, the petitioner must prove that he or she was prejudiced by such deficiency to the extent of there being a reasonable probability that, but for counsel's unprofessional errors, the result of the **proceeding** would have been different." *Id.*

■ Here, the record supports the PCR court's finding that Petitioner failed to meet his burden of establishing appellate counsel was deficient for failing to raise the directed verdict issue. *See id.* (holding the burden of proof is upon the petitioner in PCR actions to show appellate counsel's performance was deficient). Although trial counsel testified the issue was preserved and he believed the State would not have proceeded to trial without Petitioner's wired conversation with Paden, appellate counsel did not testify as to his reasons for declining to raise the issue on appeal. *See Thrift,* 302 S.C. at 539, 397 S.E.2d at 526 ("[A]ppellate counsel is not required to raise every nonfrivolous issue that is presented by the record."); *id.* at 539–40, 397 S.E.2d at 526 (holding petitioner's appellate attorney's testimony that she reviewed the issue

petitioner requested that she raise on appeal and consciously decided not to brief the issue clearly supported the PCR court's finding that appellate counsel was not ineffective). Further, the testimony from the PCR hearing does not show how the directed verdict issue was more promising or had any more merit than the issues appellate counsel chose to raise on appeal. *See Jones,* 463 U.S. at 752–53, 103 S.Ct. 3308 (noting the importance of appellate counsel selecting the most promising issues for appellate review, especially when oral arguments are limited by time restrictions); *Ard v. Catoe,* 372 S.C. 318, 331, 642 S.E.2d 590, 596 (2007) ("In a PCR proceeding, the burden is on the applicant to prove the allegations in his application.").

More importantly, even if Petitioner could show appellate counsel was deficient, Petitioner failed to prove prejudice as a result of the deficiency. *See Southerland,* 337 S.C. at 616, 524 S.E.2d at 836 (holding "the petitioner must prove that he or she was prejudiced by such deficiency to the extent of there being a reasonable probability that, but for counsel's unprofessional errors, the result of the **proceeding** would have been different").

▮▮▮▮ An appellate court reviews the denial of a directed verdict by viewing the evidence and all reasonable inferences in the light most favorable to the State. *State v. Weston,* 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). "A case should be submitted to the jury if there is any substantial evidence, either direct or circumstantial, which tends to prove the guilt of the accused or from which his guilt may be fairly and logically deduced." *Brown v. State,* 307 S.C. 465, 468, 415 S.E.2d 811, 812 (1992). "[O]ur duty is not to weigh the plausibility of the parties' competing explanations. Rather, we must assess whether, in the light most favorable to the State, there was *any* evidence from which the jury could infer [the defendant's] guilt." *State v. Larmand,* 415 S.C. 23, 32, 780 S.E.2d 892, 896 (2015); *see also State v. Bennett,* 415 S.C. 232, 237, 781 S.E.2d 352, 354 (2016) ("Therefore, although the *jury* must consider alternative hypotheses, the *court* must concern itself solely with the existence or non-existence of evidence from which a jury could reasonably infer guilt. This objective test is founded upon reasonableness. Accordingly, in ruling on a directed verdict motion where the State relies

on circumstantial evidence, the court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt.").

 Considering the evidence in the light most favorable to the State, we find that even if counsel had raised the directed verdict issue on direct appeal, a reasonable probability of a different outcome does not exist because Petitioner would not have been entitled to a reversal; that is, the State provided independent evidence to corroborate Petitioner's statements about the murders.

 "It is well-settled law that a conviction cannot be had on the extra-judicial confessions of a defendant unless they are corroborated by proof *aliunde* of the *corpus delicti.*" *State v. Abraham,* 408 S.C. 589, 592, 759 S.E.2d 440, 441 (Ct.App.2014) (footnote omitted). Stated another way, the State must prove the *corpus delicti* of the murders with evidence from a source other than Petitioner's confessions. "In a murder trial, the *corpus delicti* consists of two elements: the death of a human being and the criminal act of another causing the death." *Brown,* 307 S.C. at 467, 415 S.E.2d at 812. "This Court has held that the *corpus delicti* of murder may be established by circumstantial evidence when it is the best evidence obtainable." *Id.* "Circumstantial evidence ... gains its strength from its combination with other evidence, and all the circumstantial evidence presented in a case must be considered together to determine whether it is sufficient to submit to the jury." *State v. Rogers,* 405 S.C. 554, 567, 748 S.E.2d 265, 272 (Ct.App.2013). "[T]he corroboration rule is satisfied if the State provides sufficient independent evidence which serves to corroborate the defendant's extra-judicial statements and, together with such statements, permits a reasonable belief that the crime occurred." *State v. Osborne,* 335 S.C. 172, 180, 516 S.E.2d 201, 205 (1999).

 "A confession in a legal sense is restricted to an acknowledgment of guilt made by a person after an offense has been committed and does not apply to a mere statement or declaration of an independent fact or facts from which such guilt might be inferred." *State v. Epes,* 209 S.C. 246, 261, 39 S.E.2d 769, 775 (1946). The corroboration rule applies whether a statement amounts to a confession or merely constitutes

an admission of essential facts from which guilt might be inferred. *Osborne*, 335 S.C. at 178, 516 S.E.2d at 203–04.

> The need for corroboration extends beyond complete and conscious admission of guilt—a strict confession. Facts admitted that are immaterial as to guilt or innocence need no discussion. But statements of the accused out of court that show essential elements of the crime ... stand differently. Such admissions have the same possibilities for error as confessions. They, too, must be corroborated.

*Id.* at 178, 516 S.E.2d at 204 (quoting *Opper v. United States*, 348 U.S. 84, 91, 75 S.Ct. 158, 99 L.Ed. 101 (1954)).

We note that at trial and during the PCR hearing, the State maintained Petitioner's alleged statements to Brown and Wright were sufficient evidence to corroborate Petitioner's confession to Paden. However, the State concedes in its brief to this court, and we agree, that Petitioner's alleged statements to Brown and Wright were also confessions requiring corroboration. *See Osborne*, 335 S.C. at 178, 516 S.E.2d at 204 ("We think that an accused's admissions of essential facts or elements of the crime, subsequent to the crime, are of the same character as confessions and that corroboration should be required."); *State v. Saltz*, 346 S.C. 114, 137, 551 S.E.2d 240, 253 (2001) ("The State must produce proof of the *corpus delicti* from a source other than the out-of-court confession of a defendant.").

Nevertheless, the record includes sufficient independent evidence to support and corroborate the trustworthiness of Petitioner's statements to Paden, Brown, and Wright regarding the shootings. The record establishes that Petitioner and Trey sold drugs in a sophisticated drug organization led by Brown. Petitioner introduced Trey to Brown and the organization; therefore, according to organizational mores, Petitioner became responsible for Trey's shortcomings within the organization. The record is replete with evidence that Trey owed Brown money and the two argued over Trey's failure to pay the debt. The disciplinary methods within the organization supplied Petitioner with a motive to kill Trey. Additionally, Brown testified regarding other potential motives for Petitioner to have killed Trey, including jealousy of Trey's success in the organization, feelings of betrayal, and drug usage of the

drugs the group was supposed to sell. *See People v. Edmonds,* 223 A.D.2d 455, 637 N.Y.S.2d 71, 72 (1996) (holding evidence of participation in a drug organization provided motive, relevant background information, and completed the narrative of events leading up to the shooting); *State v. Sweat,* 362 S.C. 117, 124, 606 S.E.2d 508, 512 (Ct.App.2004) ("Generally, motive is not an element of a crime that the prosecution must prove to establish the crime charged, but frequently motive is circumstantial evidence . . . of the intent to commit the crime. . . ."); *State v. Williams,* 321 S.C. 327, 339, 468 S.E.2d 626, 633 (1996) (upholding a defendant's conviction and death sentence when "circumstantial evidence existed from which the jury could conclude that [the defendant] had the motive, means, and opportunity to perform the homicides"); *State v. Thomas,* 159 S.C. 76, 80–81, 156 S.E. 169, 170–71 (1930) ("The rule[s] that evidence tending to show motive or absence of motive on the part of [the] accused is relevant and admissible[ ] and that a wide latitude in the admission of this kind of evidence is permissible[ ] are particularly applicable * * * in cases of circumstantial evidence, motive being a circumstance bearing on the identity of the accused as the perpetrator of the crime." (fifth alteration in original)).

Further, phone records indicate that on the morning of the crimes, Petitioner paged Trey and Trey returned the call five minutes later—the last recorded outgoing call on Trey's phone. Subsequently, Trey hurriedly grabbed a large sum of money and left his home, heading to the liquor house. Witnesses placed Petitioner in close proximity to the liquor house around the time the crimes occurred between 9:00 a.m. and 12:00 p.m. Also, in that time frame, Petitioner ran into his home, sweating and out of breath, changed clothes, and asked his child's mother to throw away a black trash bag for him, warning her to make sure she did not throw the bag away at her house. Other witnesses also testified they noticed Petitioner changed outfits that morning and he never again wore the same outfit he wore between 9:00 a.m. and 12:00 p.m. that morning.

Moreover, a reasonable inference can be drawn that Petitioner asked Trey to meet him at the liquor house and he knew Goldsmith would be at the house, as it was Goldsmith's residence. Finally, forensic evidence provides additional evi-

dence to corroborate Petitioner's confessions. Trey's body and Goldsmith's body were discovered in the same room of the liquor house. An expert opined both were shot between 9:00 a.m. and 12:00 p.m. and remained in the liquor house for seven or eight hours before they were discovered. An officer testified ballistic fingerprints from the bullet projectiles discovered at the crime scene showed all the bullets were fired from the same gun and both Goldsmith and Trey were shot with a .38 caliber gun. These acts, statements, and forensics combined create circumstantial evidence that Trey and Goldsmith died as the result of a criminal act of another—here, Petitioner. *See Rogers*, 405 S.C. at 567, 748 S.E.2d at 272 ("Circumstantial evidence ... gains its strength from its combination with other evidence, and all the circumstantial evidence presented in a case must be considered together to determine whether it is sufficient to submit to the jury.").

Based on the foregoing, and given our appellate standard of review, we find the corroboration rule is satisfied as the State provided sufficient independent evidence which serves to corroborate Petitioner's extra-judicial statements and, together with such statements, permits a reasonable belief that he committed the crimes. *Osborne*, 335 S.C. at 180, 516 S.E.2d at 205. *See Larmand*, 415 S.C. 23, 32, 780 S.E.2d 892, 896 (2015) ("[O]ur duty is not to weigh the plausibility of the parties' competing explanations. Rather, we must assess whether, in the light most favorable to the State, there was *any* evidence from which the jury could infer [the defendant's] guilt."); *see also State v. Bennett*, 415 S.C. 232, 237, 781 S.E.2d 352, 354 (2016) ("[I]n ruling on a directed verdict motion where the State relies on circumstantial evidence, the court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt.").

Accordingly, we affirm. *See Gilchrist v. State*, 364 S.C. 173, 179, 612 S.E.2d 702, 705 (2005) (holding appellate counsel was not ineffective for failing to argue an issue on appeal because the issue did not amount to reversible error); *Bennett*, 383 S.C. at 309–10, 680 S.E.2d at 276 (holding the PCR court erred in finding appellate counsel ineffective for failing to brief an issue because even if appellate counsel's performance was deficient, such performance did not prejudice the petitioner).

## CONCLUSION

For the foregoing reasons, we hold the PCR court did not err in concluding appellate counsel was not ineffective, and we affirm the PCR court's order denying relief.

SHORT and McDONALD, JJ., concur.