802 S.E.2d 623

**The STATE, Respondent,**

**v.**

**Courtney Shante THOMPSON, Appellant,**

**and**

**The State, Respondent,**

**v.**

**Robert Antonio Guinyard, Appellant.**

**Appellate Case No. 2014-001198**
**Opinion No. 5485**

Court of Appeals of South Carolina.

Heard March 8, 2017

Filed May 11, 2017

Rehearing Denied August 16, 2017

---

194

Mitzi Campbell Williams, of Lexington; and Chief Appellate Defender Robert Michael Dudek, of Columbia, for Appellant Courtney Shante Thompson.

Matthew G. Gerrald, of Barnes, Alford, Stork & Johnson, LLP; and Chief Appellate Defender Robert Michael Dudek, both of Columbia, for Appellant Robert Antonio Guinyard.

Attorney General Alan McCrory Wilson, Special Assistant Attorney General Amie L. Clifford; and Solicitor Daniel E. Johnson, all of Columbia, for Respondent.

GEATHERS, J.:

Appellants, Courtney Shante Thompson (Mother) and Robert Antonio Guinyard (Father), were tried jointly and convicted of homicide by child abuse (HCA) and unlawful conduct toward a child. They now seek review of their convictions, arguing the trial court erred in denying their respective motions for a directed verdict on each charge because the State failed to present substantial circumstantial evidence of guilt. Appellants also challenge the admission of photographs of their son (Victim) pursuant to Rule 403, SCRE, arguing any probative value the photographs may have had was substantially outweighed by the danger of unfair prejudice.[1] We affirm.

---

1. We consolidate Mother's and Father's appeals pursuant to Rule 214, SCACR.

## FACTS/PROCEDURAL HISTORY

At approximately 6:15 p.m. on July 1, 2013, Richland County Emergency Medical Services received a call to respond to a cardiac arrest at Appellants' home. When first responders arrived at the home, they found Victim, a four-year-old boy, lying on the floor in the living room. He was wearing jeans, but no shirt. Victim was not moving or breathing, he had no pulse, and he was cold to the touch. A paramedic checked Victim's heart for electrical activity, but tragically, she found none. Subsequently, investigators from the Richland County Sheriff's Department found Victim's blood on the walls of the living room, hallway, and rear bedroom as well as on a white metal pipe that also had Father's blood on it.[2]

Mother gave her first statement to police at 9:45 p.m. on July 1, 2013. In her statement, she indicated that she went to Richland Memorial Hospital on June 29, 2013 to give birth to another child and was discharged from the hospital on July 1, 2013 in the early afternoon. She further indicated that after she arrived home, she discovered Victim had wet the floor in the play room. She alleged Victim was autistic and would soil and wet his surroundings. She also alleged she got in the shower and started washing off when she "heard a loud noise like a tumbling fall." She stated she got out of the shower and found Victim on the floor in the play room with his feet toward the dresser. She further stated,

> He was crunched up and his body was stiff. His butt was up in the air[,] and he was [kind of] on his head. ... He was biting his lip hard. ... When I popped his lip out from his teeth to keep him from biting it off[,] he went flat on me. He just dropped. ... He was not responding. ... I picked [Victim] up like he was a baby and took him to the front room (living room). Blood was coming from his lip. I had blood on my hand and went to my room to get my phone off the floor. I called 911. They told me how to do CPR. I did what he told me. ... When [the ambulance] got there[,] they put something on his chest[,] and they did not do nothing. They just said that he was gone.

---

2. It could not be determined when the blood was transferred to the walls or the pipe.

Father also gave a statement to police on July 1, 2013. He alleged he was cooking dinner earlier that evening when he heard a "boom." Mother allegedly came down the hallway with Victim in her arms and Victim "was in and out." Father further alleged that after Mother called 911, he hid in a closet with the new baby because he was afraid the baby would be taken away.

On July 2, 2013, Dr. Amy Durso, a forensic pathologist, performed Victim's autopsy and reported the cause of death as "[e]xtensive soft tissue hemorrhage and bleeding ... due to multiple acute and healing blunt force injuries due to non-accidental trauma." Later that day, police investigators went over the autopsy results with Mother, who then gave a second statement, explaining to investigators that her first statement "was not the truth." Mother alleged that when she came home from the hospital, she found Victim naked, lying in a puddle of urine, and "very weak." Victim allegedly was drinking water "like he had not had water in days. ... His feet, legs, knee, butt, and arms were swollen and kind of blue. [Victim] was just out of it." Mother further alleged that after she went to take a shower, she heard Victim

> crying like he was in pain and getting hit. I jumped out of the shower. [Victim] was stretched out on the floor in my room. I stood [Victim] up and he dropped to his knees. [Victim] was breathing funny. [Victim] fell to the floor. ... [Victim] was walking down the hall[,] and he collapsed after taking about three steps. [Victim] balled up[,] and it looked like he was having a seizure. ... I talked [to Victim] that morning at around 11 [a.m.] and my son told me that he was beaten with a pole. ... When I got home[,] I saw blood flecks on the walls in the play room[,] [o]n the walls in the [hallway,] and on my room door. There was blood on the closet door in my room[,] and the door had a hole in the middle. There was blood in the carpet.

Later that evening, Appellants were arrested and charged with HCA and unlawful conduct toward a child.

On July 5, 2013, Victim's paternal grandmother, Patricia Guinyard, asked police to accompany her to Appellants' home to collect some clothes for Father and Appellants' newborn child. According to the police investigators accompanying Mrs.

Guinyard, she was going through a large pile of clothing in Appellants' master bedroom closet when she found a child's size 5 shirt, still wet with blood, buried in the pile. DNA testing indicated the blood on the child's shirt was Victim's blood.

Appellants were tried together on May 19–28, 2014. At trial, the State presented the testimony of Dr. Olga Rosa, a forensic pediatrician who was qualified as an expert in child abuse pediatrics. Dr. Rosa reviewed Victim's medical records from his birth on April 18, 2009 through September 11, 2012, his last known doctor visit. Dr. Rosa also reviewed Victim's developmental records and genetic counseling records, photographs relating to Victim's death, and Dr. Durso's autopsy report. Dr. Rosa testified that the Department of Social Services (DSS) placed Victim in foster care on June 19, 2009, when he was only two months old, and DSS returned Victim to Appellants' care on April 6, 2012. According to Mother, DSS placed Victim in foster care because of an incident in which Victim almost fell out of the vehicle she was driving.

With the exception of some initial instability, Victim thrived during his time in foster care. Dr. Rosa stated that Victim was not autistic. She explained that Victim failed an autism screening test at his eighteen-month well-child checkup merely because he was having speech difficulties at the time, which is common for children in foster care. Dr. Rosa also stated that by March 2012, Victim was "growing well." Dr. Rosa reported,

His growth parameters [were] great. ... He [was] toilet trained, and he [was] speaking ... in two to three word sentences, complete sentences. He [was] interacting. He [was] socialized ... he [had] what we call social [adaptive] skills, so he [could] interact with same age peers, with adults, with his teachers at the level of almost a three-year-old.

However, soon after DSS returned Victim to Appellants in April 2012, he began regressing. Denise Jones, Victim's last foster mother, testified she spoke to Mother over the telephone a couple of days after DSS returned Victim to Appellants. Mother told Jones that Victim would not use the bathroom. Jones told Mother that Victim was using the bathroom when he was living with her and asked Mother to let her know

if she needed any help. However, Jones never heard from Mother again. Similarly, Dr. Monica McCutcheon, who saw Victim for his three-year-old well-child checkup in September 2012, testified Mother reported Victim "was having some issues with wetting and soiling himself" and complained that his speech "was not as good as his two-year-old sibling."

Family members gave several eyewitness accounts of Appellants' abuse of Victim. Two of Mother's sisters, Natalie and Maria, testified and indicated that except for "a couple of weeks" when Victim lived with Natalie,[3] Victim lived with Appellants from April 2012 until his death. Natalie explained that she took Victim into her own home for a while because Mother was frustrated with Victim soiling and wetting the floors in the house. Natalie and Maria also witnessed Mother beating Victim. Natalie took photographs of the resulting bruises to show to DSS.

Natalie also testified that Mother told her she wanted Victim "to go back to DSS so they could give him a beating and a killing and a raping." Natalie stated she had seen Father hit Victim, but "in the way [ ] a father should, he smacked him in the back of the head, but not to hurt him." However, she admitted she told police that Father "would beat [Victim]." Natalie also stated Appellants would hit Victim because he had problems with wetting and soiling himself and his surroundings. Additionally, Natalie recounted stories of Appellants depriving Victim of food and Victim having to be careful not to get caught eating anything.

Angela Metze, the grandmother of Victim's half-sister, testified she observed Victim shortly after DSS returned him to Appellants in April 2012, and he appeared to be a happy, healthy, well-nourished child. However, she noticed that over the course of the following year, Victim lost a significant amount of weight and became withdrawn. In February 2013, Metze received photographs showing bruises and scars on

---

**3.** The testimony indicates this time period did not line up with the period set forth in the HCA indictments ("on or between June 15, 2013 and July 1, 2013"), which would have been the last two weeks of Victim's life—Natalie testified, "Shortly after we got him, took him to get the stuff he needed, they wanted him back." Similarly, Maria testified that after Victim stayed with Natalie for a couple of weeks, Mother took him back.

Victim's back. She contacted DSS several times, and she shared the photographs with a pediatrician, who also contacted DSS.

Mother's other sister, Crystal, lived with Appellants from April 2012 to October 2012. According to Crystal, during this period, Mother once asked her to hold Victim's legs so Mother could "whoop him" for soiling his surroundings and "playing in it." Crystal refused to do so and left. Additionally, Crystal witnessed Father punch Victim and make Victim sit on the toilet for three hours. Crystal also recounted an occasion when Mother stated that she did not care "if the retarded bastard died" and if DSS did not take Victim, "she was going to kill him and bury him so DSS would not take her other baby."

Crystal spoke to Mother over the telephone on the afternoon of July 1, 2013 after Mother returned from the hospital with her newborn, and Mother told her she was going to take a shower. According to data retrieved from Mother's cell phone, this call occurred at 5:05 p.m., a little over an hour before Mother made the 911 call. After Mother and Crystal ended their call, Mother's cell phone inadvertently dialed Crystal's phone number, and Crystal overheard Victim "getting beat" and crying out "Lord, help me," along with Mother telling Victim, "Hush." Crystal then heard Mother and Father talking to each other. Crystal subsequently ended the call.

Dr. Durso testified that during Victim's autopsy, her external examination revealed several scars over Victim's head; orbital contusions (a/k/a black eyes); lacerations to his lips; deep injuries on the inside of his lower lip; several scars on his arms; several abrasions on his torso, buttocks, and lower legs; a healing bite mark on his back, which, based on the size of the mark, was inflicted by a teen or adult; and a swollen knee. Dr. Durso's internal examination revealed a pale thyroid gland, which indicated heavy blood loss; two rib fractures, one occurring between ten days and six weeks prior to Victim's death and the other occurring within twenty-four hours prior to death; and a healing fracture to his upper left arm, one to two weeks old, overladen with an acute hemorrhage, indicating a site of repeated injury.

Additional injuries revealed in the internal examination were multiple bruises to Victim's head, an indicator of abuse;[4] a subdural hemorrhage,[5] indicating a significant blunt force impact and dating from five to seven days prior to death; and profuse "bleeding and hemorrhage" in the soft tissues of Victim's lower back, his buttocks, the backs of his legs, and the backs of his arms, which confirmed suspected multiple bruises Dr. Durso noticed in these areas during the external examination. The soft tissue injuries with bright red or dark red hemorrhaging were "probably less than eighteen to twenty-four hours old" and the injuries with yellow hemorrhaging were older and could not be dated. Dr. Durso explained that the combined new and old soft tissue hemorrhaging "contributed to the blood loss of [Victim] so . . . he [was] no longer able to circulate enough blood to give [whatever oxygen] he need[ed] to his brain to maintain his vital functions in his body."

Dr. Durso stated that in the one to two weeks prior to his death, Victim would not have been able to use his left arm due to it being fractured and he would have been guarding that arm because it would have been extremely painful.[6] Dr. Durso also stated any caregiver would have noticed that (1) Victim was not using that arm, (2) he was in pain, and (3) he was not acting "like a normal four-year-old." Additionally, the subdural hemorrhage that occurred five to seven days before Victim's death would have placed enough pressure on Victim's brain to cause lethargy, possible vomiting, and possible temporary unconsciousness "after the blow." According to Dr. Durso, a parent would notice these symptoms and recognize that his or her child "was not acting right."

Dr. Durso concluded that Victim's injuries had been intentionally inflicted; Victim had been chronically abused; anyone coming in contact with Victim would have noticed the excruciating pain Victim experienced as a result of the multiple soft

---

4. Dr. Durso explained that her internal examination confirmed suspected multiple bruises she noticed during the external examination.

5. The dura is a layer surrounding the brain.

6. This two-week period lines up with the period set forth in the HCA indictments ("on or between June 15, 2013 and July 1, 2013").

tissue injuries; and if he had received medical attention before his final beating, his life could have been saved. She further explained, "You have a limit on how much blood you can lose. When you go over that limit and your brain is no longer getting that blood supply, that's when he would have died, that last bit of blood that came out into his soft tissues after that beating."

Dr. Rosa largely corroborated Dr. Durso's findings. Dr. Rosa stated that from seventy-two hours to a week before Victim's death, he would have shown symptoms of the subdural hemorrhage and a subarachnoid hemorrhage,[7] including nausea, vomiting, lethargy, drowsiness, headaches, possible seizures, and abnormal limb movements. Dr. Rosa also stated Victim would have vocalized his pain from his two rib fractures, one of which was ten days to six weeks old and the other occurring within twenty-four hours before his death. Further, Victim's arm fracture would have prevented him from appropriately using his arm.

Dr. Rosa opined that the physical abuse inflicted on Victim during the last two months of his life caused his death. She also explained that in the days leading up to his death, it would have been obvious to anyone that something was wrong with Victim and he needed medical treatment, even if his bruising and scars were not easily visible. If Victim had been taken to a doctor during the several days before his death, ultimately, Dr. Rosa would have been consulted and Victim could have been saved.

At the conclusion of the State's case-in-chief, Appellants made their respective directed verdict motions, and they renewed these motions at the appropriate times. However, the trial court denied the motions, and the jury ultimately returned guilty verdicts against Appellants on the charged offenses. Both were sentenced to life imprisonment without parole for HCA and ten years for unlawful conduct toward a child. The trial court ordered Mother's ten-year sentence to run consecutively to her life sentence and Father's ten-year sentence to run concurrently to his life sentence. These appeals followed.

---

7.  "Arachnoid" refers to another layer surrounding the brain.

## ISSUES ON APPEAL

1.   Was there substantial circumstantial evidence of Mother's guilt to justify the trial court's denial of her directed verdict motion?

2.   Was there substantial circumstantial evidence of Father's guilt to justify the trial court's denial of his directed verdict motion?

3.   Did the admission of photographs of Victim's body taken at the crime scene and during his autopsy violate Rule 403, SCRE, due to their probative value being substantially outweighed by the danger of unfair prejudice?

## STANDARD OF REVIEW

Directed Verdict

"On appeal from the denial of a directed verdict, this [c]ourt views the evidence and all reasonable inferences in the light most favorable to the State." *State v. Pearson*, 415 S.C. 463, 470, 783 S.E.2d 802, 806 (2016) (quoting *State v. Butler*, 407 S.C. 376, 381, 755 S.E.2d 457, 460 (2014)). "If the [S]tate has presented 'any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused,' this [c]ourt must affirm the trial court's decision to submit the case to the jury." *State v. Hepburn*, 406 S.C. 416, 429, 753 S.E.2d 402, 409 (2013) (quoting *State v. Cherry*, 361 S.C. 588, 593–94, 606 S.E.2d 475, 478 (2004)).

Admission of Evidence

"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion. An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *State v. Goodwin*, 384 S.C. 588, 601, 683 S.E.2d 500, 507 (Ct. App. 2009) (quoting *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006)).

A trial [court's] decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances. [This court] review[s] a trial court's decision regarding Rule 403[, SCRE,]

pursuant to the abuse of discretion standard and [is] obligated to give great deference to the trial court's judgment. *State v. Collins*, 409 S.C. 524, 534, 763 S.E.2d 22, 28 (2014) (citation omitted) (quoting *State v. Adams*, 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003)).

## LAW/ANALYSIS

### I. Directed Verdict Motions

Appellants argue the trial court erred in denying their respective motions for a directed verdict on each charge because the State failed to present substantial circumstantial evidence of guilt. We disagree.

When considering circumstantial evidence in evaluating a directed verdict motion, the trial court "must submit the case to the jury if there is 'any substantial evidence [that] reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced.'" *Pearson*, 415 S.C. at 473, 783 S.E.2d at 807 (quoting *State v. Bennett*, 415 S.C. 232, 236–37, 781 S.E.2d 352, 354 (2016)). "[W]hen the State fails to produce substantial circumstantial evidence that the defendant committed a particular crime, the defendant is entitled to a directed verdict." *Id.* at 469, 783 S.E.2d at 805 (alteration in original) (quoting *State v. Odems*, 395 S.C. 582, 586, 720 S.E.2d 48, 50 (2011)). "The trial [court] 'should not refuse to grant the directed verdict motion when the evidence merely raises a suspicion that the accused is guilty.'" *Id.* (quoting *Cherry*, 361 S.C. at 594, 606 S.E.2d at 478). "'Suspicion' implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof." *Id.* at 469–70, 783 S.E.2d at 805 (quoting *Cherry*, 361 S.C. at 594, 606 S.E.2d at 478).

Nonetheless, "when the State relies exclusively on circumstantial evidence and a motion for a directed verdict is made, the trial [court] is concerned with the existence or nonexistence of evidence, not with its weight." *Id.* at 469, 783 S.E.2d at 805. "[A] trial [court] is not required to find that the evidence infers guilt to the exclusion of *any other reasonable hypothesis*." *Id.* at 470, 783 S.E.2d at 805 (quoting *State v. Ballenger*, 322 S.C. 196, 199, 470 S.E.2d 851, 853 (1996)).

[A]lthough the *jury* must consider alternative hypotheses, the *court* must concern itself solely with the existence or non-existence of evidence from which a jury could reasonably infer guilt. This objective test is founded upon reasonableness. Accordingly, in ruling on a directed verdict motion where the State relies on circumstantial evidence, the court must determine whether the evidence presented is *sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt.*

*Id.* at 473, 783 S.E.2d at 807 (alteration in original) (third emphasis added) (quoting *Bennett*, 415 S.C. at 237, 781 S.E.2d at 354).

### A. Homicide by Child Abuse

Section 16-3-85(A)(1) of the South Carolina Code (2015) provides, "A person is guilty of [HCA] if the person causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life. . . ." "Child abuse or neglect" is defined in section 16-3-85 as "an act *or omission* by any person which causes harm to the child's physical health or welfare." S.C. Code Ann. § 16-3-85(B)(1) (2015) (emphasis added). Further,

"harm" to a child's health or welfare occurs when a person:

(a) inflicts *or allows to be inflicted* upon the child physical injury, including injuries sustained as a result of excessive corporal punishment;

(b) fails to supply the child with adequate food, clothing, shelter, or *health care*, and *the failure to do so causes a physical injury or condition resulting in death*; or

(c) abandons the child resulting in the child's death.

S.C. Code Ann. § 16-3-85(B)(2) (2015) (emphases added). Moreover, "[f]or purposes of the HCA statute, 'extreme indifference' has been defined as 'a mental state akin to intent characterized by a deliberate act culminating in death.'" *McKnight v. State*, 378 S.C. 33, 48, 661 S.E.2d 354, 361 (2008) (quoting *State v. Jarrell*, 350 S.C. 90, 98, 564 S.E.2d 362, 367 (Ct. App. 2002)).

Here, the evidence and all reasonable inferences, viewed in the light most favorable to the State, show (1)

Appellants' custody of Victim and their failure to seek medical treatment for him during the last two weeks of his life, when it was obvious he needed treatment, caused Victim's death and (2) his death occurred under "circumstances manifesting [Appellants'] extreme indifference to human life." *See* § 16-3-85(A)(1) ("A person is guilty of [HCA] if the person causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life . . . ."); § 16-3-85(B)(1) (defining "child abuse or neglect" as "an act *or omission* by any person which causes harm to the child's physical health or welfare" (emphasis added)); *Pearson*, 415 S.C. at 470, 783 S.E.2d at 806 ("On appeal from the denial of a directed verdict, this [c]ourt views the evidence and all reasonable inferences in the light most favorable to the State." (quoting *Butler*, 407 S.C. at 381, 755 S.E.2d at 460)).

Specifically, the testimony of Dr. Durso and Dr. Rosa established that one to two weeks prior to Victim's death, he was exhibiting pain and other obvious symptoms of repeated physical abuse and he could have been saved had he received medical treatment. Further, given the severity of Victim's symptoms and the history of Appellants' animosity toward Victim, a juror could reasonably infer that Appellants' failure to seek medical treatment for Victim was more than mere neglect but rather a deliberate choice, i.e., "a deliberate act." *McKnight*, 378 S.C. at 48, 661 S.E.2d at 361 ("For purposes of the HCA statute, 'extreme indifference' has been defined as 'a mental state akin to intent characterized by a deliberate act culminating in death.'" (quoting *Jarrell*, 350 S.C. at 98, 564 S.E.2d at 367)); *cf. Jarrell*, 350 S.C. at 99, 564 S.E.2d at 367 (stating a parent has a duty to serve his or her child's best interests); *Hill v. State*, 415 S.C. 421, 435, 782 S.E.2d 414, 421 (Ct. App. 2016) ("Generally, motive is not an element of a crime that the prosecution must prove to establish the crime charged, but frequently motive is circumstantial evidence . . . of the intent to commit the crime . . . ." (quoting *State v. Sweat*, 362 S.C. 117, 124, 606 S.E.2d 508, 512 (Ct. App. 2004))). Moreover, Mother's stay at the hospital during this two-week period was merely two and one-half days, from June 29 through the early afternoon of July 1, 2013. Therefore, Mother

had enough time at home with Victim to be aware of his symptoms.

The record also includes evidence of Appellants inflicting, or allowing the infliction of, physical harm on Victim resulting in his death as well as additional evidence of Appellants' extreme indifference. Dr. Rosa stated that the cause of Victim's death was the cumulative effect of the chronic physical abuse inflicted on Victim during the last two months of his life. In the light most favorable to the State, Appellants' custody of Victim during these two months and the previous history of Appellants' abuse of Victim implicate both Mother and Father; a juror could reasonably infer that either parent inflicted the fatal abuse while the other parent was aware of the abuse and acquiesced in it. *See* § 16-3-85(B)(1) & (2)(a) (defining "child abuse or neglect" as "an act *or omission* by any person which causes harm to the child's physical health or welfare" and " 'harm' to a child's health or welfare" as "inflict[ing] *or allow[ing] to be inflicted* upon the child physical injury, including injuries sustained as a result of excessive corporal punishment" (emphases added)).

Even more compelling was the evidence concerning Victim's last beating. First, the records from Mother's cell phone and Crystal's testimony regarding Mother's inadvertent call, or "pocket dial," show both parents were present when Victim was beaten for the last time, near the time of his death. Crystal overheard Victim "getting beat" and "scream[ing] for help," along with Mother telling Victim, "Hush." Crystal then heard Mother and Father talking to each other before Crystal ended the call. A juror could reasonably infer that either parent beat Victim while the other parent was present and acquiesced in the abuse. Further, when first responders arrived at Appellants' home in response to Mother's 911 call, they noticed Victim was wearing jeans but no shirt. Four days later, Victim's paternal grandmother found a child's size 5 shirt, still wet with blood, buried in a large pile of clothing in the master bedroom closet. DNA testing indicated the blood on the child's shirt was Victim's blood.

Because the shirt was still wet with Victim's blood four days after his death, a reasonable juror could infer Victim was wearing it during his final beating, when both parents were

present, and the appearance of blood made both parents aware of the grave trauma being inflicted on Victim. Perhaps when a disinterested bystander fails to help a victim of brutal violence, it can be characterized as mere neglect; but when a parent fails to save his or her own son from such brutality, it is "a deliberate act." *McKnight*, 378 S.C. at 48, 661 S.E.2d at 361 ("For purposes of the HCA statute, 'extreme indifference' has been defined as 'a mental state akin to intent characterized by a deliberate act culminating in death.'" (quoting *Jarrell*, 350 S.C. at 98, 564 S.E.2d at 367)); *cf. Jarrell*, 350 S.C. at 99, 564 S.E.2d at 367 ("A parent has a specific and [non]delegable duty to serve the best interests of her child and should make every effort not to knowingly place her child in harm's way."); *id.* ("[The appellant] could have prevented the murder of her son merely by choosing to stay home. Her failure to protect her child is concrete evidence of her indifference towards his life.").

We note Appellants rely heavily on the circumstantial evidence analysis in *Hepburn*, in which our supreme court reviewed a mother's HCA conviction and held there was insufficient evidence that she, rather than her boyfriend, inflicted the abuse resulting in her child's death. 406 S.C. at 438–40, 753 S.E.2d at 414–15. The appellant and her boyfriend were at home with the child when she sustained her fatal injuries,[8] and they were tried jointly. *Id.* at 418, 753 S.E.2d at 403. The court recognized the incongruity in the State's attempt to defend the denial of the appellant's directed verdict motion by relying on the testimony given by her codefendant, Brandon Lewis, during his own defense:

[T]he State contends it presented substantial circumstantial evidence warranting the trial court's denial of the Appellant's directed verdict motion, focusing on Appellant's circumstances at the time of the victim's death, namely scant evidence that she was frustrated by her failure to secure employment, living situation, and parental responsibilities; the medical testimony concerning the severity of the victim's injuries; but most predominantly *Lewis's testimony*

---

8. The maternal grandmother and her boyfriend were also in the home, but they were asleep on the opposite side of the house. *Id.* at 418, 419 n.2, 753 S.E.2d at 403, 403 n.2.

that he heard Appellant shake the victim prior to finding her unresponsive in her crib.

*Id.* at 440, 753 S.E.2d at 414–15.

▉ The court refused to consider the codefendant's testimony in assessing the sufficiency of the evidence, recognizing an exception to the "waiver rule" when a codefendant testifies and implicates the appellant in the charged crime.[9] *Id.* at 436, 753 S.E.2d at 412. The court also refused to consider the appellant's testimony presented in her defense because her testimony did not serve to fill gaps in the State's evidence but "merely rebutted [her codefendant's] testimony." *Id.* at 436–38, 753 S.E.2d at 412–13. Without the benefit of the codefendant's testimony, the State was unable to convince the court that the directed verdict motion was properly denied. *Id.* at 438–42, 753 S.E.2d at 413–16. The court explained,

> Barring Lewis's testimony, . . . we find the State did not present substantial evidence that Appellant killed the victim. Every State witness placed Appellant asleep at the time the victim sustained the fatal injuries. While undoubtedly present at the scene, the only inference that can be drawn from the State's case is that one of the two [codefendants] inflicted the victim's injuries, but not that *Appellant* harmed the victim.

*Id.* at 440, 753 S.E.2d at 415.

Unlike the State's predominant focus on the codefendant's testimony in *Hepburn*, the State's predominant focus in the present appeal has been on the medical testimony and the testimony of family members who witnessed Appellants' abuse of Victim. The State presented this testimony during its case-in-chief.

Further, in *Hepburn*, the evidence indicated the victim's fatal injuries occurred within mere hours before she was taken to a hospital and diagnosed with a subdural hematoma and retinal hemorrhaging, and "[e]very State witness placed Ap-

---

**9.** When a defendant presents evidence in his behalf following the denial of his directed verdict motion, the waiver rule "requires the reviewing court to examine *all* the evidence rather than to restrict its examination to the evidence presented in the Government's case-in-chief." *Id.* at 430 n.15, 753 S.E.2d at 409 n.15 (emphasis added) (quoting *United States v. White*, 611 F.2d 531, 536 (5th Cir. 1980)).

pellant asleep at the time the victim sustained the fatal injuries." *Id.* at 419–21, 440, 753 S.E.2d at 403–04, 415.[10] In stark contrast, the medical testimony in the present case indicates Victim's death resulted from the cumulative effect of repeated physical abuse over the last two months of his life. Both Dr. Durso and Dr. Rosa clearly explained that no one isolated incident, by itself, killed Victim.

Moreover, the *Hepburn* court stressed, "the victim appeared to be acting normally until after Appellant put the victim to sleep and went to sleep herself" and there was "no evidence that Appellant herself was aware of the victim's injuries." 406 S.C. at 442, 753 S.E.2d at 415–16. But here, the evidence indicates Victim's deteriorating condition should have been obvious to both Mother and Father during the last two weeks of his life. In sum, we conclude Appellants' reliance on *Hepburn* is misplaced.

Based on the foregoing, we find the State's evidence "sufficient to allow a reasonable juror to find [Appellants] guilty [of HCA] beyond a reasonable doubt." *Pearson*, 415 S.C. at 473, 783 S.E.2d at 807 (quoting *Bennett*, 415 S.C. at 237, 781 S.E.2d at 354). Therefore, we affirm the denial of Appellants' respective directed verdict motions on the HCA charge.

## B. Unlawful Conduct

The respective unlawful conduct indictments allege, "on or between April 18, 2009 to July 1, 2013," Appellants placed Victim "at unreasonable risk of harm affecting [Victim's] life, physical or mental health, or safety; or did unlawfully or maliciously cause or cause to be done bodily harm to [Victim] so that the life or health of [Victim] was endangered or was likely to be endangered." In other words, the State charged Appellants with neglecting or abusing Victim on at least one occasion during the entire span of his short life.

Section 63-5-70(A) of the South Carolina Code (2010) defines unlawful conduct toward a child in the following manner:

It is unlawful for a person who has charge or custody of a child, or who is the parent or guardian of a child, or who is

---

10. The victim died a few days later. 406 S.C. at 418, 753 S.E.2d at 403.

responsible for the welfare of a child as defined in Section 63-7-20 to:

(1) *place the child at unreasonable risk of harm* affecting the child's life, physical or mental health, or safety;

(2) do or cause to be done unlawfully or maliciously any bodily harm to the child so that the life or health of the child is endangered or likely to be endangered; or

(3) wil[l]fully abandon the child.

(emphasis added).

The evidence supporting the HCA indictments also supports the indictments for unlawful conduct. Appellants' complicity in Victim's beatings during the last two months of his life and their failure to seek medical treatment for him during the last two weeks of his life placed him "at unreasonable risk of harm" affecting not only his physical and mental health but also his life. § 63-5-70(A)(1).

Additionally, the State presented abundant evidence showing Appellants' neglect and abuse of Victim prior to the last two months of his life. The testimony of Dr. Rosa and Dr. McCutcheon indicated that Appellants failed to follow up with medical professionals' recommendations for Victim's care while he was in their custody. Further, Mother's sisters recounted numerous instances of Appellants' abuse of Victim. While Crystal lived with Appellants from April 2012 to October 2012, she witnessed several occasions of Mother or Father hitting Victim. Around Easter 2013, Maria heard Mother beating Victim and Victim crying. Maria later saw Victim limping. Natalie also witnessed Mother beating Victim, and on some of these occasions, Father was present. Natalie took photographs of the resulting bruises to show to DSS. Moreover, Natalie witnessed both parents depriving Victim of food, which was consistent with Angela Metze's observation that Victim had lost a significant amount of weight from the spring of 2012 to the spring of 2013. The food and liquid deprivation continued through at least the end of May 2013.

These eyewitness accounts constitute compelling direct evidence of Appellants' neglect and abuse of Victim. The DNA evidence found in Appellants' home was also compelling. Victim's blood was found on the walls of the living room, hallway,

and rear bedroom as well as on a white metal pipe that also had Father's blood on it.

We find the foregoing evidence more than sufficient to show Appellants neglected Victim's needs, placing him "at unreasonable risk of harm" affecting his health, and maliciously inflicted "bodily harm" on Victim so that his health and life were "endangered." § 63-5-70(A)(1) & (2). Therefore, we affirm the denial of Appellants' directed verdict motions on the unlawful conduct charges.

## II.  Photographs

Appellants argue that certain photographs of Victim should have been excluded from evidence pursuant to Rule 403, SCRE, because any probative value the photographs may have had was substantially outweighed by the danger of unfair prejudice. We disagree.

Rule 403 states, in pertinent part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Unfair prejudice means an undue tendency to suggest a decision on an improper basis." *State v. Lyles*, 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct. App. 2008) (quoting *State v. Gilchrist*, 329 S.C. 621, 627, 496 S.E.2d 424, 427 (Ct. App. 1998)). "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence. . . ." *State v. Gray*, 408 S.C. 601, 616, 759 S.E.2d 160, 168 (Ct. App. 2014) (quoting *Gilchrist*, 329 S.C. at 630, 496 S.E.2d at 429).

"When juxtaposing the prejudicial effect against the probative value, the determination must be based on the entire record and will turn on the facts of each case." *Lyles*, 379 S.C. at 338, 665 S.E.2d at 206.

A trial [court's] decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances. [This court] re-

view[s] a trial court's decision regarding Rule 403[, SCRE,] pursuant to the abuse of discretion standard and [is] obligated to give great deference to the trial court's judgment. *Collins*, 409 S.C. at 534, 763 S.E.2d at 28 (citation omitted) (quoting *Adams*, 354 S.C. at 378, 580 S.E.2d at 794).

■ In *Collins*, our supreme court held that this court "should not have invaded the trial court's discretion in admitting" pre-autopsy photographs of a dog-mauling victim "based on its emotional reaction to the subject matter presented." *Id.* at 528, 535, 763 S.E.2d at 24, 28. The court noted this evidence was "highly probative" and "material in establishing the elements of the offenses charged." *Id.* at 535, 763 S.E.2d at 28. The court explained,

> Courts must often grapple with disturbing and unpleasant cases, but that does not justify preventing essential evidence from being considered by the jury, which is charged with the solemn duty of acting as the fact-finder. As one court has astutely observed, it is the duty of courts and juries to examine the evidence in even the most unpleasant of circumstances:
>
> > Courts and juries cannot be too squeamish about looking at unpleasant things, objects, or circumstances in proceedings to enforce the law and especially if truth is on trial. *The mere fact that an item of evidence is gruesome or revolting, if it sheds light on, strengthens or gives character to other evidence sustaining the issues in the case, should not exclude it.*

*Id.* (emphasis added) (quoting *Nichols v. State*, 267 Ala. 217, 100 So.2d 750, 756 (1958)).

■ In the present case, the challenged photographs show Victim (1) as he was found at the crime scene on the day of his death and (2) during Dr. Durso's autopsy. However, the truly shocking autopsy photographs challenged by Appellants were recognized as such by the trial court and excluded from evidence. Most of these photographs were cited by Mother as "depicting [Victim's] body sliced into parts" and cited by Father as "depict[ing] Victim's body being cut into pieces."[11] Again, these photographs were excluded from evidence.

---

11. Neither Mother's nor Father's characterization of these photographs is accurate. The photographs actually show several long incisions made

Those autopsy photographs admitted into evidence over the objections of defense counsel showed deep lacerations on the inside of Victim's lower lip and bruising on Victim's shoulder, torso, back, buttocks, and legs.[12] These photographs, while graphic, were necessary to help the jury fully understand Dr. Durso's testimony regarding the nature of Victim's injuries resulting in his death. *See Gray*, 408 S.C. at 610, 759 S.E.2d at 165 ("The evaluation of probative value cannot be made in the abstract, but should be made in the practical context of the issues at stake in the trial of each case."); *cf. State v. Holder*, 382 S.C. 278, 290, 676 S.E.2d 690, 697 (2009) ("We find the photographs clearly demonstrate the extent and nature of the injuries in a way that would not be as easily understood based on the testimony alone.").[13] Further, Dr. Durso explained during her proffered testimony that State's Exhibit 230 was necessary to illustrate the soft tissue swelling in one of Victim's knees when contrasted with his other knee. Likewise, the photographs of Victim as he was found at the crime scene helped the jury to understand the nature and extent of Victim's injuries as well as his condition near death. Moreover, the photographs were highly probative of Appellants' awareness of Victim's injuries.

In sum, the probative value of the admitted photographs was high. Further, the photographs did not tend "to suggest a

by Dr. Durso down Victim's back and the backs of his legs to allow her to determine the extent of soft tissue hemorrhaging. The exposed hemorrhaging is what makes these photographs shocking.

**12.** Mother complains about two photographs in which Victim's genitals were exposed. However, one of these photographs, State's Exhibit 226, was not admitted into evidence—during Dr. Durso's proffered testimony, she confirmed the trial court's recollection that there was another photograph of the same injuries, without a view of Victim's genitals, already in evidence. The other photograph, State's Exhibit 230, was cropped so that the copy presented to the jury did not show Victim's genitals.

**13.** *See also Holder*, 382 S.C. at 291, 676 S.E.2d at 697 ("Although the photographs were graphic, the facts in this case were graphic, and there is no suggestion that their admission had an undue tendency to suggest a decision on an improper basis."); *Jarrell*, 350 S.C. at 106–07, 564 S.E.2d at 371 ("[W]hile some of 'the photograph[s] are graphic, the facts of the case are very graphic' and the photos helped the jury understand the pathologist's testimony." (second alteration in original)).

decision on an improper basis." *Lyles*, 379 S.C. at 338, 665 S.E.2d at 206. Therefore, the photographs cannot be characterized as unfairly prejudicial for purposes of Rule 403. *See Gray*, 408 S.C. at 616, 759 S.E.2d at 168 ("Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence . . . ." (quoting *Gilchrist*, 329 S.C. at 630, 496 S.E.2d at 429)).[14]

Based on the foregoing, we affirm the trial court's admission of the challenged photographs pursuant to Rule 403. *See Collins*, 409 S.C. at 534, 763 S.E.2d at 28 ("A trial [court's] decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances. [This court] review[s] a trial court's decision regarding Rule 403[, SCRE,] pursuant to the abuse of discretion standard and [is] obligated to give great deference to the trial court's judgment." (citation omitted) (quoting *Adams*, 354 S.C. at 378, 580 S.E.2d at 794)).

## CONCLUSION

Accordingly, we affirm Appellants' respective convictions for HCA and unlawful conduct toward a child.

**AFFIRMED.**

MCDONALD and HILL, JJ., concur.

---

14. For these same reasons, the photographs do not violate the prohibition set forth in *State v. Middleton*, 288 S.C. 21, 24, 339 S.E.2d 692, 693 (1986), which Mother cites in her brief. In *Middleton*, our supreme court held, "[P]hotographs calculated to arouse the sympathies and prejudices of the jury are to be excluded *if they are irrelevant or unnecessary* to the issues at trial." *Id.* (emphasis added); *see also Gray*, 408 S.C. at 610, 759 S.E.2d at 165 ("[P]hotographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are . . . not *necessary* to substantiate *material* facts or conditions." (quoting *State v. Torres*, 390 S.C. 618, 623, 703 S.E.2d 226, 228 (2010))). Here, the photographs were relevant and necessary.